**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edward Palmer VAUGHN, William McMurtrey and Lee Cleveland Rutherford, Defendants-Appellants.**

No. 76–1437.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1977.

Norman S. London, Lawrence J. Fleming, St. Louis, Mo., for defendants-appellants.

Robert W. Rust, U.S.Atty., Miami, Fla., Dennis A. Winston, Atty., George S. Kopp,

---

Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

COLEMAN, Circuit Judge.

This appeal presents an odd factual background, coupled with a rarely encountered legal issue.

These appellants, Edward Palmer Vaughn, William McMurtrey, and Lee Cleveland Rutherford, were jointly indicted in one count and convicted of conspiracy to import approximately 2,050 pounds of Jamaican marijuana to Florida. Indeed, according to the government's proof, the importation was actually accomplished and went altogether undetected until one of the participants, over a year later, for self serving reasons, decided to talk. Leaving aside the parole terms, Vaughn was sentenced to serve 3 years, McMurtrey 5 years, and Rutherford 4 years.

The alleged conspiracy began in St. Louis on June 1, 1973. The marijuana arrived in Key Largo, Florida, on July 23, 1973. No agent or officer of the United States government suspected it or knew anything of it until September 14, 1974. In the meantime, of course, the marijuana had been distributed, far and wide. Thus, we have a marijuana case in which none of the 2,050 pounds of contraband was either seized or offered in evidence. The case depends entirely on the assertions of one participant, corroborated in some respects by two others.

The government learned of the alleged conspiracy and importation from one William Mize, upon whom it chiefly relied to make out its case at the subsequent trial of these appellants. Mize, however, did not decide to talk until after he had been indicted for six felonies in the District Court for the Southern District of Illinois, of which he was convicted and sentenced to imprisonment for 22 years.

While at large on $25,000 bail on the Illinois charges, Mize, in violation of his bail terms, left the district and got caught in Florida, along with his wife, smuggling 5,600 pounds of marijuana. Bail on this charge was set at $25,000. His bail in Illinois was raised from $25,000 to $100,000. Not being able to raise bail, Mize languished in jail.

It was at this point that Mize decided to tell all about the 1973 venture, but before doing so he was careful to drive a hard bargain with the prosecutors. First, it was agreed that as to the 5,600 pounds of marijuana on which he had recently been apprehended he would plead guilty to one count and the sentence would run concurrently with that imposed, or to be imposed, in Illinois. Next, he would not be prosecuted on the 1973 venture which is the subject of this appeal. Lastly, it was agreed that Mrs. Mize would not be prosecuted for anything. These agreements had been carried out prior to the trial of these appellants. Thus, Mize got no additional prison time for either of his massive marijuana violations. Charges against his wife were dropped.

On the morning that the trial of these appellants was to begin, Mize, who had been brought down from the Federal Penitentiary in Atlanta, balked at testifying unless he received assurances that he would be moved from the Atlanta Penitentiary to a more satisfactory place, such as Lexington, Kentucky. While the prosecutors gave no positive commitment on this point, we think it may be fairly deduced from the record that Mize's approach on this subject was not altogether rebuffed.

Mize took the witness stand as the first witness for the government. He detailed the activities of these appellants, from Missouri to Florida, to Jamaica, and back again.

He told of organizing the sailboat to go from Florida to Jamaica after the illicit cargo, of how he and his confederates lolled around luxuriously in Jamaica waiting on the sailboat to arrive, and of how they repaired the auxiliary engines of the boat

after it did arrive. He detailed the negotiations with the Jamaicans by which the marijuana was acquired. He described in detail how Jamaican customs were eluded, including taking the marijuana out on one boat and transferring it to the sailboat. He told how a fishing boat was bought in Miami and sent to a rendezvous with the marijuana boat in Bimini, where the contraband was reloaded on that vessel for the final successful run to Key Largo. It is a fascinating story. But for Mize's general character and palpably self-serving motivation for testifying, it had the ring of truth.

Mize's past convictions, his motivation for talking to government officials in the first place and for testifying afterwards, were relentlessly and scornfully explored by counsel for the defendants. In those respects Mize was thoroughly riddled, but he stuck tenaciously to his version of what happened, and who did it, in the Jamaican-Florida marijuana period, June-July, 1973.

The government next presented the testimony of a Jamaican, Handel Newell, a photographer at a racetrack concession. He testified that he assisted the conspirators in arranging, in the Jamaican hills, for the acquisition of the marijuana from its Jamaican producers, at $10 per pound, Jamaica dollars. He knew nothing of the participation of Rutherford in the conspiracy, since Rutherford had only gone out to Bimini to assist in bringing in the marijuana on the last leg of the voyage to Florida. Newell knew that McMurtrey had been in Jamaica but did not tie him into the conspiracy other than by observed personal association with Vaughn. Newell put Vaughn in, up to his ears. But it developed that Newell had been promised immunity in return for his testimony, that Mize had suggested that he be sent for as a witness, that Mize's wife had gone to Jamaica to solicit his appearance as a witness, that Mize had paid him $5,000 in connection with the 1973 negotiations, that he thought his testimony would help Mize, and this was his motivation for testifying.

Mrs. Mize, produced as a witness for the government, admitted on the witness stand that she knew "approximately" what her husband had been doing in the earlier years in Illinois [stealing goods from railroads in interstate commerce and fencing goods stolen by others], that she came down with her two young sons to Key Largo in July, 1973, that she saw the marijuana boat when it landed at the house which had been rented on a canal in Key Largo, that Vaughn and Rutherford got off the boat when it landed, that McMurtrey was already there awaiting the arrival of the boat, that all parties were highly jubilant over the success of the venture, that the marijuana was weighed and divided among the several participants at the Key Largo house, that McMurtrey took his portion of it and left for St. Louis, pulling a U-haul trailer. She had been married to Mize for 19 years and candidly confessed her interest in helping him in any way that she could.

Mrs. Mize had driven from Illinois to court in Florida in a 1973 Cadillac which she had purchased for cash, with money given her by her husband. She and her children were then on welfare. She had registered the Cadillac as the property of her sister.

The foregoing testimony, as already stated, resulted in the conviction of all three appellants, followed by this appeal.

Here is where the interesting legal problem enters the picture. Edward Palmer Vaughn, William Joseph McMurtrey, and Lee Cleveland Rutherford were not the only defendants named in the indictment. The others were: Phillip Murray Vaughn, Carol Bilott, Cathy Vaughn, Dirk Warren Stokes, James Norton, Marvin Reading, Thomas Joseph Cavanaugh, Robert Romeo (also known as Robert Romero), Sheldon Barry Corwin (also known as Sidney Collins), James Edward Griffin, and Brian Cavanaugh. All of the male defendants entered pleas of guilty to the indictment. The females, who obviously had been along merely as female accompanists, were dismissed.

When the trial court began qualifying the prospective jury on the voir dire, this is what he said to the jury:

Ladies and gentlemen of the jury, this is a criminal case and it comes before you by virtue of an indictment.

The indictment reads:

"The United States of America vs. Edward Palmer Vaughn, Phillip Murray Vaughn, Carol Bilott, Cathy Vaughn, Dirk Warren Stokes, James Norton, Marvin Reading, Thomas Joseph Cavanaugh, Robert Romeo, also known as Robert Romero, William Joseph McMurtrey, Sheldon Barry Corwin, also known as Sidney Collins, James Edward Griffin, Brian Cavanaugh and Lee Cleveland Rutherford."

Now, preliminarily, I will tell you this is a conspiracy case. These people are all originally named as defendants, but today we have (3) only for trial, Mr. Edward Palmer Vaughn, Mr. William Joseph McMurtrey, and Mr. Lee Cleveland Rutherford.

All of the other defendants—and I will tell you this to satisfy your curiosity and explain a point of law to you also—all of the other defendants have either been dismissed by the Government or have entered pleas of guilty.

Now, that fact has nothing whatsoever to do with the guilt or innocence of these three people who are being tried, and I am only telling you because it is natural for you to wonder why all these people were named and only a few of them are being tried. (This was followed by a general exposition of the law of conspiracy.)

The defendants then moved the Court to strike the voir dire and to impanel another jury on the ground that their clients had been "irreparably prejudiced by the Court's indication to the jurors in the instruction that, in fact, the individuals named as alleged co-conspirators have pled guilty". The attention of the Court was called to the fact that there was no physical evidence to support the existence of the offense, that no marijuana was ever seized, that the only testimony to be offered to show the offense was committed was that of an informer. It was further argued that by indicating to the jury that some people charged had pled guilty, the Court was, in effect, corroborating the otherwise uncorroborated version to be offered by Mize and the other government witnesses.

The trial court denied the motion, saying that there was a Fifth Circuit case, "right square on the point". He did not identify the case but he was obviously referring to *United States v. Johnson,* 5 Cir. 1972, 455 F.2d 311, a case decided on our summary calendar.

None of the defendants who pled guilty or who had been dismissed were called by the government as witnesses. It might be said that from the prosecution standpoint there was hardly any necessity for it because the jury had been told at the outset, by the Court, that some of the co-indictees had pled guilty, thus solemnly confessing the existence of the conspiracy and their participation in it. Those co-defendants were frequently mentioned by the Mizes and Newell. The Court warned the jury, as already set forth, that the pleas had nothing at all to do with the guilt or innocence of the defendants about to go to trial.

As the case thereafter developed, it would be hard to visualize one in which the government was forced to rely solely upon such a scheming set of self-serving connivers, who repeatedly admitted that their testimony was motivated by a desire to escape from, or to blunt the punitive impact of, habitual criminal conduct. Dealing, as it has to do every day, with hardened, professional criminals, the government, of course, has to do the best it can with the proof available. If juries believe testimony emanating from reprehensible sources, as this jury did, credibility determinations belong to them alone, not to prosecutors, or defense counsel, or judges, trial or appellate.

■ This, of course, does not erase the issue of whether this jury would have believed the government's testimony had it not known from the beginning that various co-indicted confederates had judicially confessed the existence of the conspiracy and their participation in it, as related in detail from the witness stand by the Mizes and

Newell. Did the warning that they were not to consider these pleas remove any reasonable likelihood of harmful prejudice? It is an accepted maxim that juries are presumed to follow the instructions of the Court. This presumption, however, is not water tight, because we have often held that some things are too prejudicial to be cured by the strongest cautionary instruction.

■ There is no way to learn the answer from an evidentiary record. Our appellate function, then, is to decide the matter consistently with existing precedent.

The outcome is controlled by our decision in *United States v. Hansen,* 5 Cir. 1977, 544 F.2d 778 (dated January 3, 1977). It was there held that where a codefendant pleads guilty before a trial commences and the jury never sees him as a defendant there is no need to explain his absence; that where a trial judge, prior to voir dire, advises the jury that a co-defendant has entered a plea of guilty, a cautionary instruction will not avoid reversible error.

It was further held that if the judge thinks an explanation is necessary all the judge should do is to tell the jury that the case is proceeding against the arraigned defendant only, that the jury is not to be concerned with any other party.

That this should be declared the law in this Circuit was quite clearly foreshadowed by what Judge Simpson wrote in the opinion which decided *United States v. Harrell,* 5 Cir. 1970, 436 F.2d 606:

Again, we decide only the case before us. But we think that the evidentiary purpose ordinarily to be served by proof of a co-defendant's plea of guilty is so shadowy, so insubstantial that it would be the better practice in the run-of-the-mill cases to exclude such proof altogether.

If the case should be retried, we state that we have examined *in camera* the statement which Mize gave in Illinois, January 6–8, 1975, and find that it contains no Jencks Act material; indeed, quite the opposite.

The judgments of conviction are reversed and remanded for a new trial.