**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ronnie Joseph BRUSCINO and Charles Eugene Kell, Defendants-Appellants.**

Nos. 80–2336, 80–2337.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1981.

Decided Oct. 20, 1981.

Mary M. Runnells, Bloomfield, Ind., Robert F. Hellman, Jessie A. Cook, Terre Haute, Ind., for defendants-appellants.

Lloyd Bryce Monroe, Asst. U. S. Atty., Virginia Dill McCarty, U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before CUDAHY, Circuit Judge, and GIBSON * and FAIRCHILD, Senior Circuit Judges.

FAIRCHILD, Senior Circuit Judge.

On October 30, 1978, Robert Martinez, an inmate at the federal penitentiary in Terre Haute, Indiana, died as a result of head injuries inflicted by blunt force approximately an hour before his death. Shortly after Martinez was discovered, defendant-appellant Ronnie Bruscino, a fellow inmate at Terre Haute, was apprehended on suspicion of the murder and placed in segregation. Defendant-appellant Charles Kell, also an inmate at Terre Haute, was confined to segregation as a suspect the following day. Over one year later, on December 19, 1979, Bruscino and Kell were indicted for conspiracy to murder Martinez[1] and for the murder itself. Following a jury trial, Bruscino was found guilty of conspiracy and of first degree murder. Kell was convicted of conspiracy and second degree murder.

Bruscino and Kell raise numerous issues on appeal. We conclude that the jurors' exposure to extraneous, prejudicial material during the trial tainted the verdicts against both Bruscino and Kell. We therefore reverse and remand for further proceedings consistent with this opinion.

## I.

Co-defendant Howell, an inmate serving time for bank robbery and conspiracy to escape and who had previously pled guilty to second degree murder of Martinez, see note 1, supra, was the government's chief witness regarding the murder. He stated that he first met Bruscino in 1977, at the United States Marshal's office in Los Angeles, California. The next time he saw Bruscino was in late September, 1978, in the prison yard at Terre Haute. Bruscino had been transferred to Terre Haute from the penitentiary at McNeil Island, Washington. Bruscino told Howell then that Robert Martinez was a "rat." A week later, Bruscino asked Howell to befriend Martinez so that Howell could lure Martinez to a place where they could kill him. Howell tried befriending Martinez a couple of times by sharing marijuana with him, but failed to establish any rapport.

In October, 1978, on the day Bruscino learned that he was to be transferred back to McNeil Island, Howell, Bruscino, Barron, Norman and Kell had lunch together. Bruscino told them of the impending transfer and said that he didn't want to go back because "he hadn't got Chino yet." Howell could not point to anything specific regarding Kell's participation in the ensuing conversation. Bruscino later told Howell that he was going to fake a back injury to delay his transfer.

On October 30, 1978, the morning of the murder, Howell and Hebb, another inmate, practiced garrotting with Bruscino in the kitchen of the prison. They decided that they could not garrote Martinez because he could not be lured into the vegetable room at the back of the kitchen. Howell testified that the three of them then joined co-defendants Norman, Barron and Kell for lunch. At lunch they decided that Kell was to lure Martinez into the small weight room in the gymnasium complex, with the promise of heroin supplied by Barron. Howell

---

* Honorable Floyd R. Gibson, Senior Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

1. Count I of the indictment charged Bruscino and Kell with conspiracy to commit murder, in violation of 18 U.S.C. §§ 1117 and 2. Count II charged them with first degree murder in violation of 18 U.S.C. §§ 1111 and 2. Both counts of the indictment also charged Dennis Norman, Dennis Barron and Eddie Howell with the crime.

Co-defendants Norman and Barron pled guilty to the conspiracy count, in return for which the government moved for an order dismissing Count II, which the court granted. Co-defendant Howell entered a plea of guilty to the offense of second degree murder, a lesser included offense of Count II. Following the trial, on June 20, 1980, he pled guilty to Count I and received a one year sentence to be served concurrently with the sentence he was currently serving. The government then moved for an order dismissing Count II of the indictment against Howell.

was unable to testify as to who exactly said what, but he thought Kell said "cool." On cross-examination, Howell stated that he couldn't remember Kell's exact words but that he did acknowledge an agreement.

After supper that night, Howell met Bruscino in the small weight room. Howell stated that Bruscino went in and out of the room periodically, and Howell eventually went upstairs to the arts and crafts room. When Howell returned, Bruscino was still alone, but this time he was wearing an extra set of clothes. Howell stated that Bruscino then told Howell that Norman would bring Martinez into the small weight room and while they were fixing heroin, Bruscino "would hit him over the head and take him out." Howell and Kell, whom Howell had not yet seen that evening, were to guard the door leading from the gymnasium corridor into the restroom and the small weight room.[2] Howell testified however, that he did not communicate to Kell in any way that it was Kell's responsibility to help guard the door. Neither did he know whether anyone else had told Kell about this assignment. While Howell and Bruscino were talking, Norman brought Martinez into the small weight room. Howell then moved from the small weight room into the restroom, where he began talking to Kell, who had come in and was washing daubers and dye materials in the sink. Two inmates came in and used the urinals. Then Butcher, another inmate, walked into the small weight room asked to use a set of small weights, said a few words to Howell and Kell, and left. Howell told Kell that it would be stupid for Bruscino to do anything now, because Butcher had seen all of them.

Howell was about to leave when Bruscino called from the small weight room for Howell to come help with a bar. When Howell walked in, he picked up a 25 pound weight lying on a weight bench. He saw Martinez and Norman kneeling at the weight bench in the corner, cooking heroin in a spoon. Howell then watched Bruscino raise a

weight in the air and crash it down on Martinez' head. At this point, Norman grabbed the narcotics paraphernalia, ran into the restroom and flushed it down the toilet. Bruscino grabbed Martinez and started to drag him toward the shower stall in the restroom. Howell heard Bruscino say, "He doesn't look dead to me." Bruscino then picked up the weight and began hitting Martinez again. While Bruscino was hitting Martinez, Howell saw a black inmate come in, who asked for a match. Howell said he didn't have one. Norman gave him a match and the inmate left. Howell then noticed that Martinez' body had been moved, and institutional clothing put over the head. Only Bruscino was left in the room. Howell told Bruscino to get rid of his pants, which had blood splattered on them.

Bruscino and Howell then left the restroom and went upstairs to the arts and crafts area. Bruscino went to the leather room. Howell went to the art room and arranged for the art room instructor, inmate Honore, to sign both him and Bruscino in on the art room roster. When the 8:00 p.m. movement began, Howell went to his cell. He and his cellmate Barron checked Howell's clothes for blood and scrubbed Howell's shoes in the event Howell had stepped in blood. They then shot up with heroin and Howell walked down to the day room. Howell also stated that he did not see Kell leave the restroom and did not see Kell again that night after Bruscino called Howell into the small weight room.

Inmate Hebb testified that Bruscino entered Hebb's cell shortly after the 8:00 p.m. movement began. Hebb stated that while he watched for a corrections officer, Bruscino ripped his clothes apart and flushed them down the toilet. Bruscino put on a T-shirt and pants from Hebb's cell, and gave Hebb the shoes he was wearing. Hebb later threw the shoes in the garbage.

---

2. The restroom, adjoining the small weight room, was the only restroom in the gymnasium, arts and crafts complex. It was therefore necessary for inmates working in the arts and crafts area upstairs, as well as those using the gymnasium and pool room, to use the downstairs restroom.

Martinez' body was discovered shortly after the 8:00 p. m. movement by inmate Gusan, who summoned prison officers for help. Khaki pants, a short-sleeved Khaki shirt and fatigue jacket and two towels were found in the restroom. The pants, short-sleeved shirt and both towels had Martinez' blood on them. The short-sleeved shirt had one Negroid head hair in the pocket, and there was brown Caucasian hair on the fatigue jacket.

Hebb's testimony corroborated Howell's version of the conspiracy. Bruscino told Hebb about his plan to stage an accident and delay his transfer to McNeil Island so that he could take care of "unfinished business." The night after Bruscino dropped his weights and allegedly feigned a back injury, Hebb saw Bruscino in Kell's cell and heard Bruscino say "there had to be some way in order to get him down there." He did not hear who Bruscino was referring to, nor did he know whether Kell responded.

Hebb stated, however, that the discussion on the day of the murder, regarding Bruscino's plan for Kell to lure Martinez, took place at supper, rather than lunch, as Howell had testified. He stated that he saw Howell and Bruscino sitting together at lunch, but that they didn't talk about anything in particular. He then testified that he saw Bruscino at dinner, sitting with Kell, Howell and Barron. Hebb did not join them, however, but sat at the table directly behind them. He testified that he asked Bruscino if he were going to the gym that evening and Bruscino said "No, that he had some business to take care of." Hebb did not testify to any statement Kell may have made during the conversation. (Howell, however, had testified that he (Howell) did not eat dinner that night.)

Inmate Smith testified that Bruscino, on the morning of the murder, tried to persuade Smith, who worked in the dining room with Bruscino, to lure Martinez into the milk freezer off of the kitchen. Smith told Bruscino that this idea probably wouldn't work as Martinez did not know Smith. Smith also testified that he had gone to the gymnasium during the 7:00 p.m. movement. He bought some marijuana from Barron, who was shooting pool in the poolroom next to the gymnasium, and saw Bruscino, Kell and Norman. He then joined inmates Sawyer and Fay on the bleachers in the basketball court. After a few minutes, Sawyer left and headed for the corridor. Smith said he noticed Kell, Norman and Martinez standing in the doorway to the gym when Sawyer left, but that they were not there when Sawyer returned approximately five minutes later.

Both Bruscino and Kell took the stand and denied every aspect of their role in the conspiracy and murder. It was their theory that either Norman, Sawyer or Smith had murdered Martinez.

Inmate Fay, a key defense witness, testified that he went to the gym complex with Sawyer and Smith at the 7:00 p. m. movement on October 30, 1978. Norman approached them and asked Sawyer and Smith to get Martinez into the restroom on the pretense of buying heroin so that Norman could rob Martinez of the heroin Martinez had. Sawyer and Smith agreed, talked to Martinez in the poolroom, and the three of them entered the restroom. Shortly afterwards, Norman and another inmate entered the restroom. Fay then went to the gym and sat on the bleachers. Five or ten minutes before the movement, Sawyer and Smith joined them. Each had five packs of heroin, which they hid in their pants, saying there was going to be "one hell of a shakedown." Sawyer remarked about a "good hit," and Smith said "yeah, that hitting him in the throat stopped all that yelling." Fay stated that both Sawyer and Smith were nervous and anxious to get out of the gym. When movement was called a few minutes later, they passed Norman, who was then standing in the doorway to the poolroom. Smith said to Norman, "so far, so good, they haven't stumbled into it yet."

Fay told F.B.I. agent Blackketter the same story when Blackketter interviewed him on November 28, 1977. Also at trial, Blackketter testified that following Fay's testimony, Blackketter spoke with Sawyer

as a potential rebuttal witness. During the interview, Sawyer confessed to the murder, stating that he, Smith and Howell did it.[3]

Bruscino also called Justin Martinez, Robert Martinez' brother, to the stand. Martinez testified that his brother had called him about ten days prior to his death and said that some "Negroes" were after him and were going to kill him. According to Martinez, "Negroes" in Spanish means either someone of the black race, or someone that is no good.

Bruscino testified that he had lunch on October 30 with inmates Sanchez and Valdez. That evening, he said, between 6:30 and 7:00 p. m., he went to the art room to work on a painting. He stayed there until the 8:00 p. m. movement. Inmates Jones, Ross and Sawkow testified in support of Bruscino's alibi.

Kell, who is partially deaf, testified that he was friendly with Martinez because they both worked in the canvas shop. On October 30, Kell had lunch with Nelson and another inmate, and dinner with inmates Aubrey and Mayes.[4] After dinner, he went back to his unit to pick up his leatherwork. He discussed leather designs with inmate Clark, and then went to the hobby shop at the 7:00 p. m. movement. After arriving at the hobby shop, he went downstairs to the restroom (adjoining the weight room) to get hot water to make coffee. He then returned to the hobby shop, made coffee, and proceeded to dye a leather belt he was making for his daughter. This took about twenty to thirty minutes. When he finished, he went back to the downstairs restroom to wash out his dauber and dye equipment. He returned to the hobby shop, where he stayed until the 8:00 p. m. movement, when he left for his unit with inmates Aubrey and Mayes. Kell and Aubrey went to Kell's cell and continued to work on their leather projects until the unit was

---

**3.** Blackketter testified as follows:

*DIRECT EXAMINATION BY MR. HELL-MAN (Attorney for Defendant Bruscino):*

\* \* \* \* \* \*

Q And did, sir, Mr. Sawyer, at that time, make any statement to you in connection with his involvement in the assault upon Robert Martinez?

A Yes, sir.

\* \* \* \* \* \*

A I approached Mr. Sawyer when he was an orderly in I-East at the penitentiary. And, when I say approached, with his being an orderly he was able to walk freely so, I spoke with him through the grille door to the unit. I said Richard, "In court today, John Fay came in and stated that you, Lulion Smith and Dennis Norman were responsible for the murder of Robert Martinez." Mr. Sawyer's answer to me was, "Oh, shit." And, I said, "Yes, sir, that is what happened and I would like for you to come out to an office and we will sit down and discuss it. I will fill you in on what I know at this point and I would like to interview you about it." He again uttered a couple of swear words, and, I said, "Richard, I would like to sit down and discuss it," and he said, "Man that is not necessary, they are right, I did it." He said, "Me, So-Low [Smith] and Playboy [Howell]." I said, "Richard, that was not the testimony, the testimony was—

Q —What else did he say?

A At that point?

Q Not what you said. What he said?

A Oh, what he said. He then stated, "No, it was me, So-Low and Playboy, and, if you will bring the U.S. Attorney up here now or bring the governmental attorney, or district attorney," I think he may have referred to it as "bring the District Attorney out here now and I will sign the papers that we did it."

Q And, did he say anything further to you in connection with the Martinez' assault?

A He said to me, "Okay."

Q And, sir, did you prepare a memorandum of your conference with him that evening—last night?

A No, sir, I have not.

Mr. Hellman: No further questions, Your Honor.

Tr. at 1241–1243. During examination by the United States Attorney for the case, Blackketter stated that Sawyer had previously told him in connection with another matter that if Blackketter would arrange for Sawyer to be put back in with another prisoner, Sawyer would testify that he saw Bruscino hit Martinez in the head. Tr. at 1245. Blackketter stated that he did not pursue Sawyer's confession any further. Tr. at 1247. This is probably because Blackketter believed that "Mr. Sawyer is a liar." Tr. at 1245.

**4.** An audiologist, qualified as an expert witness, testified that Kell had a hearing impairment which could give him difficulty hearing conversation in an area with a high level of background noise, such as might be present when the prison dining room is filled to capacity.

shut down. Kell's alibi was corroborated by several witnesses, including inmates Yunkers, Medico, Clark and Aubrey. Moreover, Kell's testimony that he was in the restroom washing his leather tools was not disputed by government witnesses Howell and Butcher, both of whom testified that they saw Kell standing by the sink washing out his leather tools.

## II.

During the trial, the jury was exposed to two potentially prejudicial pieces of information not admitted into evidence. The first was Bruscino's Trial Exhibit 1, also denoted Court's Hearing Exhibit 1 ("Exhibit 1"), a document from the Bureau of Prisons entitled *Response to Administrative Remedy Request*. The second was a newspaper article concerning the trial that one of the jurors carried into the jury room in her purse.

Exhibit 1 is the administrative response to Bruscino's appeal to the Bureau of Prisons' decision to transfer him from the McNeil Island Penitentiary to the peniten-

tiary in Terre Haute, Indiana. The response stated that Bruscino was removed from disciplinary segregation pending the outcome of an investigation into his suspected involvement in the Mexican Mafia. It concluded that because there was no significant evidence regarding Bruscino's involvement in an unauthorized group, his appeal would be granted and he would be transferred back to McNeil Island.[5] Bruscino considered the statement regarding the Mexican Mafia to be so prejudicial that he secured a pre-trial stipulation from the government that no mention would be made of "any alleged relationship between one or more of the defendants and any 'prison gangs,' including, but not limited to the Mexican Mafia . . . ."

Bruscino's attorney used this document on the second day of trial, however, in cross-examining the government's first witness, the records custodian at Terre Haute, about Bruscino's scheduled transfer from Terre Haute back to McNeil Island. No mention was made of the reason for Bruscino's transfer to Terre Haute in the first place. At the conclusion of the cross-exam-

---

**5.** The text of Exhibit 1 is as follows:

Bruscino, Ronnie, 68–148
USP, McNeil Island
Part B—*Response to Administrative Remedy Request*
On May 22, 1978 you received an incident report, Code 256, Refusing to Obey an Order of any Staff Member. You appeared before the IDC on 5/24/78 and as a result of your plea of guilty to the offense, you were placed in disciplinary segregation. You were subsequently removed from disciplinary segregation pending the outcome of institution investigations regarding your suspected involvement with the Mexican Mafia.

It is your contention that you were placed in administrative detention without the benefit of being informed of the reasons for detention. In your BP–10 you stated that Captain Bishop accused you of being a member of the Mexican Mafia. As a result of that accusation, you request an investigation into the allegation to prove your innocence. You also feel that your BP–9 response was untrue and was purposely designed to mislead or deceive the reader. In addition, you indicate your BP–9 response was delivered to you beyond the established time limits for response. Finally, you request to be returned to the McNeil Island population or returned to an institution in California.

The IDC action of May 26, 1978 was appropriate in relation to the admitted offense. Your placement in administrative detention for investigative reasons was also an appropriate action in light of the circumstances of your incident report.

However, investigations by this office have not disclosed evidence of any significant nature, that would indicate your involvement in any unauthorized group.

Your BP–9 response adequately responds to your questions and does not mislead or deceive the reader. The only conclusive statements on your BP–9 are those to which you have admitted guilt or acknowledged as factual. All other responses are informative in nature and merely indicate the actions possible at the outcome of the investigations. The date of the return of your BP–9 is properly noted on the response and must be considered correct. However, it should be noted that a BP–9 response, that exceeds reply deadlines may be deemed denied by the inmate in order that the Administrative Remedy process be facilitated.

Our investigation reveals that you have already been transferred to Terre Haute or are enroute to that institution. In view of the lack of evidence supporting such a transfer, it is the decision of this office that you be returned to the McNeil Island Penitentiary as soon as possible. Your BP–10 Regional Appeal is upheld.

ination, the prosecutor asked Bruscino's attorney if he was going to move for the admission of the document. Bruscino's attorney replied "not at this time." Although Bruscino's attorney had no independent recollection of what he did with this document following cross-examination, he probably placed it on the exhibit table. During the morning recess that day, the deputy courtroom clerk took the exhibits up to the jury room.[6] He could not recall whether this document was among those exhibits. In any event, the document found its way into the jury's possession sometime during the trial. We know this because shortly after the jury was secluded, it asked to see Bruscino's Exhibit 1 and was told that it was not in evidence. The jury returned its verdict two hours later.[7]

Defendants learned of the second item of extrinsic material shortly after the trial when one of the defense attorneys happened to discuss the case with one of the jurors, Anna McLanahan. Ms. McLanahan told the attorney that during the trial, she read a newspaper article reporting Dennis Barron's guilty plea to the charge of conspiring to murder Martinez. She stated that she cut the article out of the paper and took it to court for the other jurors to read.[8] Both Kell and Bruscino moved for a new trial on the basis that extraneous prejudicial materials were present in the jury room.[9]

At the post-trial hearing on the motions for a new trial, several jurors testified that they had seen Exhibit 1, and almost all of them stated that they heard discussion of the Mexican Mafia. Ms. McLanahan testified that she couldn't remember taking the newspaper article out of her purse. Most of the other jurors could not recall seeing the article. The few that heard it discussed remembered it only in connection with trying to figure out names.

The court denied the motions for a new trial. It held that the presence of these extraneous materials in the jury room could have prejudiced neither Bruscino or Kell.

 Whether the district court abused its discretion in denying defendants' motions for a new trial on the basis of the extraneous material considered by the jury depends on whether there is a "reasonable possibility" that this material may have affected the jury's verdict. *United States v. Dressler*, 112 F.2d 972, 978 (7th Cir. 1940).

---

6. Although we were informed during oral argument that it is "common practice" for exhibits to be taken to the jury room after admission but prior to deliberations, we question the wisdom of such practice, which we find quite irregular. Not only does it lead to mishaps such as that at issue here, but it could easily cause jurors to distort the import of certain exhibits prior to proper instructions at the conclusion of the case.

7. Neither the prosecutor or the defense attorneys were informed at the time of this request and the short exchange between the court, the reporter and the bailiff.

8. The article in its entirety reads as follows:
 Indicted on charges of (1) conspiracy to commit murder and aiding and abetting and murder and (2) aiding and abetting are Ronnie Bruscino, 23, and Charles E. Kell, 32. Earlier this week two other inmates entered guilty pleas to charges of conspiracy to commit murder in connection with the Martinez death. Dennis Barron, 34, and Dennis M. Norman, 38, reportedly agreed to enter the pleas as part of a bargaining deal with the U.S. attorney's office.

Also making a guilty plea on the bargaining arrangements was one of the government's key witnesses, Eddie Joe Howell, 27. Each of the three was given a one-year sentence to run concurrently with terms they are now serving by Judge Gene Brooks.
 The government's case is being presented by Paula Lopossa. Bruscino is represented by Terre Haute attorney Robert Hellman and Kell is represented by Alfred Towell, Bloomington.
Reprinted in *United States v. Bruscino*, No. TH79–11–CR, slip op. at 15 (S.D.Ind., filed Sept. 4, 1980).

9. Kell and Bruscino had previously moved to dismiss the indictment following the presentation of the government's case. The court denied this motion at the completion of the trial. Following trial, defendant Kell moved for a judgment of acquittal and a new trial, alleging that the verdicts were inconsistent and against the weight of the evidence, and that he was prejudiced by the joint trial with Bruscino. This motion was taken under advisement by the court and decided at the same time as the motions for a new trial.

*Accord, Llewellyn v. Stynchcombe,* 609 F.2d 194, 195 (5th Cir. 1980); *United States v. Vasquez,* 597 F.2d 192, 193 (9th Cir. 1979); *United States v. Thomas,* 463 F.2d 1061, 1065 (7th Cir. 1972), *citing United States v. Grady,* 185 F.2d 273, 275 (7th Cir. 1950) (whether the error "might have operated to the substantial injury of the defendant"). This test is equivalent in severity to the harmless error rule of *Chapman v. California,* 386 U.S. 18, 24 (1967), which requires that federal constitutional errors be harmless beyond a reasonable doubt. *Gibson v. Clanon,* 633 F.2d 851, 853 (9th Cir. 1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981).[10] A stringent test is needed because jury consideration of facts not introduced in evidence denies a defendant's Sixth Amendment rights to confrontation, cross-examination and assistance of counsel with respect to the extraneous evidence. *Id.* at 854. *See Parker v. Gladden,* 385 U.S. 363, 364–65 (1966). When, as here, defendants do not learn of this extraneous material until after the verdict is rendered, they cannot offer evidence in rebuttal, a curative instruction, argument to the jury, or take other tactical steps to ameliorate its impact. *Gibson v. Clanon, supra* at 854. We have also emphasized that a trial court should "exercise special caution to keep from the minds of jurors extraneous influence during the trial of a defendant charged with a particularly shocking crime." *United States v. Dressler,* 112 F.2d 972, 981 (7th Cir. 1940).[11]

### A.

With respect to Exhibit 1, the document from the Bureau of Prisons, we must conclude that there is a "reasonable possibility" that the statement it contained regarding Bruscino's alleged involvement with the Mexican Mafia influenced the jury's verdict as to Bruscino. Such an accusation has sinister connotations that could well taint the jury's deliberations, notwithstanding the recitation that investigations failed to disclose significant evidence of Bruscino's involvement. When the murdered victim and several witnesses were, or could have been understood as being Hispanic,[12] the impact of an "official" document stating that Bruscino has been suspected of being a member of the Mexican Mafia cannot be underestimated. Obviously, the jurors were aware of the document and thought it should be considered because they specifically requested it after they began their deliberations.

In this case, there was conflicting testimony regarding the murder. Bruscino himself took the stand and denied any involvement, and his testimony was supported by several witnesses. Moreover, Bruscino's version of the events was somewhat supported by testimony regarding the unexpected (though seemingly discredited) confession of Sawyer. Where the jury's verdict depended largely on the credibility of witnesses, including the defendants, and the jury's exposure to the prejudicial material could easily have biased the jury against Bruscino's credibility, the significance of such exposure is readily apparent.

The report's impact is all the more prejudicial because the jurors evidently saw it near the beginning of the trial. *See United States v. Thomas,* 463 F.2d 1061, 1065 (7th Cir. 1972). Reconstructing the events by hindsight, the record indicates that the jurors probably came into possession of the

---

**10.** Some courts have held that prejudice from the extraneous material will be presumed unless the government demonstrates that the material did not harm the defendant. *United States v. Howard,* 506 F.2d 865, 866 (5th Cir. 1975).

**11.** We think this case qualifies for that caveat. A government witness testified that when he discovered Martinez, his face "had been pushed in all the way down to the left to where it looked like a staircase."

**12.** Three witnesses with Hispanic surnames testified, Zamarippa, Martinez and Medico (although there was some testimony that Medico was Italian), as well as a witness named Carlos Aubrey. Moreover, Bruscino and Kell, as well as several other witnesses were from the Los Angeles area and we can assume that the jurors might believe that Los Angeles has a large Hispanic population.

report during the lunch time recess on the second day of trial, but that the report was later removed from among the admitted exhibits. At the point where the jurors first saw it, the government had yet to put on its chief witnesses. Thus, the jurors' perceptions of the credibility of the government's witnesses and case may well have been colored by the impermissible notion that Bruscino was a member of the Mexican Mafia. The jury's access to this extraneous material at such a crucial time in the trial therefore tainted the entire proceeding.[13] Not only could the material have destroyed Bruscino's version before he had a chance to present his case, but it added sinister overtones to the government's emphasis on Bruscino's alleged statements to the effect that he needed "to take care of business for my people." [14] Exposure to the Mexican Mafia allegation could also have supplied the jurors with a more credible motive for the murder, as the only theory provided by the government was that Bruscino thought Martinez was a "rat."

■ There was testimony by the jurors that most of them had seen the document, and that there was considerable discussion of the Mexican Mafia. Some of the testimony impermissibly invaded the area of the mental processes of the jurors, and to that extent the district court was correct in refusing to consider it. *E. g., Llewellyn v.*

*Stynchcombe,* 609 F.2d 194, 196 (5th Cir. 1980), *citing Mattox v. United States,* 146 U.S. 140, 149 (1892).[15] To the extent, however, that the testimony showed that the record of official suspicion of Bruscino's involvement with the Mexican Mafia came to the attention of the jurors, the testimony was permissible. *United States v. Vasquez,* 597 F.2d 192, 194 (9th Cir. 1979). *See Llewellyn v. Stynchcombe,* 609 F.2d 194, 196 (5th Cir. 1980); *United States v. Dressler,* 112 F.2d 972, 979 (7th Cir. 1940). The jurors not only were aware that a document once before them was no longer present, they were aware of at least part of its contents.

■ The district judge relied on the fact that the document itself discredited the original suspicion of involvement. It is true that the fourth paragraph of Exhibit 1 said "investigations by this office have not disclosed evidence of any significant nature, that would indicate your involvement with any unauthorized group." Suspicion, however, frequently survives failure of proof, and jurors seeking an explanation for a brutal murder may well have more readily believed Bruscino guilty because the suspected Mexican Mafia involvement offered the explanation.

For these reasons, the judgment against Bruscino must be vacated and his case remanded for a new trial.

---

**13.** Its import to the jury is apparent from the jury's request to see the report shortly after beginning its deliberations. The court concluded its instructions to the jury at 12:40 p. m. on June 13, 1980, after which the jury began its deliberations. During oral argument, counsel informed us that the jury broke for lunch immediately. The jury requested Exhibit 1 at 3:20 p. m., approximately one hour after returning from lunch.

**14.** Moreover, in her opening argument to the jury, the prosecutor stated:

[A]lmost immediately upon [Bruscino's] arrival [at Terre Haute][,] he gathered about himself a group of inmates.... He discussed with these inmates business that he had to take care of at the prison. That business being killing Robert Martinez.

Tr. at 294. The defense attorneys waived opening statements so the impression created by the prosecution, which was then highlighted

by the extraneous material, was not counteracted.

**15.** Fed.R.Evid. 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify to the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

### B.

The proof against Kell was only that he aided and abetted Bruscino, and conspired with Bruscino, the principal actor. It is difficult to imagine that the jury would have convicted Kell without first convicting Bruscino. Thus ·the material which tainted the verdict against Bruscino would require setting aside the verdict against Kell. Moreover, we conclude that juror McLanahan's disobedience of the court's numerous admonitions not to read any newspaper articles regarding the case by clipping such an article and carrying it to the jury room in her purse, created a "reasonable possibility" of affecting the jury's verdict as to defendant Kell (as well as Bruscino). *E. g., United States v. Dressler,* 112 F.2d 972, 978 (7th Cir. 1940).

The article in question reported that Bruscino and Kell were indicted for conspiracy to commit murder and aiding and abetting.[16] It then stated that Dennis Barron, Dennis Norman and Eddie Howell pled guilty to the conspiracy charges.[17] Any inherent prejudice in this article must stem from its mention that three co-defendants had pled guilty. Kell considered this information to be prejudicial and had obtained a pretrial agreement from the government regarding its suppression.[18]

Kell relies on a line of Fifth Circuit cases which hold that where a co-defendant pleads guilty before the trial commences and the jury never sees him as a defendant, there is no need to explain his absence. If the trial judge then advises the jury that a co-defendant has pled guilty, a cautionary instruction will not avoid reversible error. *United States v. Vaughn,* 546 F.2d 47, 51 (5th Cir. 1977); *United States v. Hansen,* 544 F.2d 778, 780 (5th Cir. 1977). *See United States v. Corona,* 551 F.2d 1386, 1388 (5th Cir. 1977) (the information is no less prejudicial merely because the prosecutor, and not the judge, made the disclosure). We recently stated that if the jury learns of the guilty pleas by co-defendant, prompt curative instructions may prevent reversible error. *See United States v. Phillips,* 640 F.2d 87, 91 (7th Cir. 1981). In this case the newspaper article stated that co-defendants Barron and Norman pled guilty to the charge of conspiring to kill Martinez. Such information corroborated Howell's testimony regarding the persons involved in the alleged plot. The guilty pleas of Norman and Barron were silent testimony to the credibility of Howell and the government's theory:[19] if two of the co-conspirators continuously referred to in the government's case had admitted their guilt in the plot, then a third conspirator, Kell, is probably guilty as well. Yet Kell never had an opportunity to explore the silent "testimony" of Norman and Barron before the jury. He had no opportunity to determine if their admissions of guilt were based on the same facts as testified to by Howell. And this inability to cross-examine and to rebut arguments is one of the chief evils caused by jury exposure to extraneous evidence. *E.g., Gibson v. Clanon,* 633 F.2d 851, 854 (9th Cir. 1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981). The article is all the more prejudicial because Kell could not offer a curative instruction regarding the guilty pleas of co-defendants Barron and Norman. Neither the court nor the parties knew that the jury had learned of such information.[20]

---

**16.** The aiding and abetting charges were dropped in the superseding indictment. *See* note 1, *supra.*

**17.** *See* notes 1 and 8, *supra.*

**18.** The jury was informed of defendant Howell's plea agreement during his testimony at trial.

**19.** The jury knew that co-defendants Barron and Norman were named in the conspiracy because the court read the indictment to the jury as part of its charge. Instruction No. 4,

Tr. at 1395–1400. The overt acts charged in Count I of the indictment parallel Howell's testimony.

**20.** Juror McLanahan obviously read it and thought it was important because she clipped it from the newspaper and carried it in her purse to the jury room. Juror Fields testified that she remembered Ms. McLanahan talking about the article, and Juror Bratcher testified that she had read either McLanahan's article or a similar one which referred to the co-defendants pleading guilty to conspiracy.

We disagree with the district court's conclusion that the jury's knowledge of Barron's and Norman's guilty pleas was not prejudicial because it was consistent with Kell's theory of defense, namely, that "defendants attempted to prove a conspiracy to kill the victim by several people including Barron but not themselves...." Kell's chief defense was that he was not involved in any way with the murder. If there was a conspiracy, defendants suggested, it was one between Sawyer, Smith and Norman. The jury's acceptance of this theory, of course, turned on the credibility they attached to defendants' testimony and that of their witnesses. Here, however, the jury had silent corroboration of the government's theory even before the defense presented its case.[21] Moreover, these guilty pleas undercut the validity of Sawyer's confession, which exonerated Kell and Bruscino of any possible involvement in the murder. It seems to us, therefore, that the jury's knowledge of the guilty pleas, at this point in the trial, see United States v. Thomas, 463 F.2d 1061, 1065 (7th Cir. 1972), made it reasonably possible that the jurors were unable to view Kell's testimony, and that of his alibi witnesses, in a completely detached and unbiased manner. The inability to view the defense witnesses in an unbiased manner,[22] in a case where the evidence against Kell is ambiguous to begin with, could easily be fatal to Kell's case. The judgment against Kell must therefore be vacated and his case remanded for a new trial.[23]

### III.

■ Defendants appear to argue that the fourteen month delay between the date of the murder and the day they were indicted violated their Sixth Amendment right to a speedy trial, United States v. Marion, 404 U.S. 307, 320 (1971), and their Fifth Amendment right to due process, United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). During that time they were segregated in the detention unit of the prison and branded as murderers. They lost prison privileges and their prospective parole dates. Moreover, they allege, the delay impaired the memories of defense and government witnesses, and potential evidence was lost or destroyed.

Presumably, defendants base their Sixth Amendment claim on the assertion that

**21.** Juror McLanahan testified that she clipped the article the weekend after the trial had started and carried it to court with her on the next Monday, June 9. The government rested on June 10, and Kell and Bruscino tried their case from June 10 to June 12.

**22.** The jury's inability to view Kell's defense dispassionately would be exacerbated to the extent that Kell's defense is in any way dependent on Bruscino's defense, which was tainted by Exhibit 1.

**23.** Kell argues that there was insufficient evidence to show that he knowingly entered into a conspiracy to kill Martinez. This argument requires us to look at the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Doing so, and discounting the prejudicial errors in the trial, we find it impossible to conclude that there was insufficient evidence that Kell "knowingly contributed his efforts in furtherance of [the conspiracy to murder Martinez]." United States v. Garza-Hernandez, 623 F.2d 496, 501 (7th Cir. 1980). If the jury believed the testimony of Howell, Kell did more than merely associate with the conspirators. See United States v.

Scholle, 553 F.2d 1109, 1118 (8th Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). Howell testified that Kell agreed to "lure" Martinez and that Kell was assigned to guard the door to the weightroom while the murder took place. Such evidence is all that is necessary to show that Kell knowingly contributed to Martinez' murder, for the government need not prove that Kell participated in all the activities of the conspiracy or that he became a member at its inception. United States v. Garza-Hernandez, supra at 501.

Neither can we conclude that the district court erred in trying Bruscino and Kell jointly. A motion for severance lies within the discretion of the trial judge, and will be reversed only for clear abuse. United States v. Dalzotto, 603 F.2d 642, 646 (7th Cir.), cert. denied, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979). While there was more evidence that linked Bruscino to the conspiracy than Kell, the court carefully instructed the jury with regard to the use of the evidence of conversations outside of Kell's presence. The jury was also told to consider the evidence against each defendant individually. We can find no abuse of discretion on this issue.

their segregation in prison detention is comparable to "the actual restraints imposed by arrest and holding to answer a criminal charge." *United States v. Marion*, 404 U.S. at 320, *supra*. They did not press this claim on appeal however, by referring to the factors that the Supreme Court said must be considered in determining whether the right has been violated. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). We therefore deem their Sixth Amendment argument to have been waived.[24]

■ Neither can we say that defendants have shown such "actual prejudice" resulting from the pre-indictment delay as to amount to a Fifth Amendment due process violation. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Kell and Bruscino were not prejudiced by their incarceration, for they were incarcerated when the murder occurred. Disciplinary segregation, such as defendants suffered, is almost routine for prison rule infractions. Such segregation violated no right of defendants, provided that proper procedures were followed in confining them to segregation. Defendants also allege that witnesses' memories were impaired during the delay, and that evidence may have been lost or destroyed. In attempting to substantiate this claim of prejudice, however, defendants cite to no specific harm that affected them any more than the delay affected the government's case.

■ Finally, there is no constitutional rule which requires prosecutors to file charges immediately after establishing probable cause of guilt. *Id.* at 790–796, 97 S.Ct. at 2048–2052. While the government points to no compelling reason explaining its delay, there is no evidence that it delayed indicting defendants solely "to gain tactical advantage over the accused." *Id.*

at 795, 97 S.Ct. at 2051, *citing United States v. Marion*, 404 U.S. at 324, *supra*. We therefore refuse to "abort [this] criminal prosecution [altogether] simply because [we may] disagree with the prosecutor's judgment as to when to seek an indictment." *United States v. Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2049, *supra*.

## IV.

■ Although the other issues raised by defendants are unnecessary to our decision due to our resolution of the extraneous evidence question, we will discuss some of them in the event that they are raised again on remand to the district court.

Defendants object to the cross-examination and impeachment of Fay, a key witness in support of their theory that Sawyer, Smith and Norman murdered Martinez. During cross-examination, the prosecutor questioned Fay on his homosexual relationship with an inmate named Abcox. Defendants objected to this cross-examination on the grounds of relevancy. The prosecutor asserted that she was questioning Fay about Abcox in order to refresh Fay's memory regarding his homosexual relationship with the government's witness Smith, whom Fay was accusing of the murder.[25] Defendants continued to object and moved for a mistrial, stating that Fay had previously admitted his homosexual relationships with both Smith and Sawyer, so that there was no need to refresh his memory through examination of his relationship with a third inmate. The court denied the motion for a mistrial, but admonished the jury to disregard any evidence of Fay's relationship to Abcox other than for the purpose of refreshing Fay's memory as to his relationship with Smith. The court then questioned the jury as to any prejudice the

---

**24.** We note also that defendants' pre-indictment segregation was pursuant to prison administrative proceedings, in which segregation can be imposed for numerous prison rule infractions. The Fifth Circuit, at least, has held that administrative segregation does not constitute an arrest for purposes of triggering a Sixth Amendment speedy trial right. *United States v. Duke*, 527 F.2d 386, 390 (5th Cir.), *cert.*

denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 (1976).

**25.** Testimony as to Fay's relationship with Smith was admissible to show bias. *United States v. Nuccio*, 373 F.2d 168, 171 (2d Cir.), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967).

testimony regarding the homosexual relationships between Fay, Smith, Sawyer and Abcox might have caused them to have against the defendants. No one on the jury responded.

Given that Fay had already admitted his relationship with Smith, we see no legitimate purpose in the questions regarding Abcox. Objections should therefore have been sustained.

The government, relying on Fed.R.Evid. 608(a),[26] attempted to impeach Fay by questioning F.B.I. Agent William Blackketter on his opinion as to Fay's credibility.[27]

The question and answer were as follows:

Q (By Assistant U.S. Attorney, Ms. Lopossa) What is that opinion [with regard to the character or truthfulness and veracity of Mr. John Fay], Mr. Blackketter?

A I believe Mr. Fay has a capability of being less than candid, he is a manipulator, he manages to maneuver anything around to suit his well-being, and furnished information to me in an attempt to obtain a transfer—

Tr. at 1076. Bruscino's attorney immediately objected and asked that the last part of the response be stricken as unresponsive. The court sustained the objection and asked the jury to disregard the last part of Blackketter's statement concerning a transfer.

On appeal, defendants argue that Blackketter's opinion testimony as to the character of Fay should be excluded for the same reasons that a prosecuting attorney is forbidden from giving his or her opinion as to the credibility of a witness. *See United States v. Phillips*, 527 F.2d 1021 (7th Cir. 1975). We reject defendants' analogy and decline the opportunity to hold, as a rule of law, that an investigator's opinion as to the credibility of a witness is as inherently prejudicial as that of a prosecuting attorney. Under certain circumstances, Blackketter's opinion testimony could possibly be excluded under Fed.R.Evid. 403. If such a motion had been made, the district court judge should have considered Blackketter's official position in determining whether the probative value of his testimony would be substantially outweighed by the danger of unfair prejudice.

For the foregoing reasons the judgments of conviction are reversed and the causes remanded for proceedings consistent with this opinion.[28]

FLOYD R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent. I do not think this record merits vacation of the judgment against Bruscino and Kell and remand for a new trial. It is my opinion that the district court did not abuse its discretion when it ruled that no reasonable possibility exists that the two items of extraneous material discussed in Part II, *ante*, affected the jury's verdict to the prejudice of appellants.

The first item viewed as requiring remand because of its exposure to the jury is Bruscino's Trial Exhibit 1. The majority points out that the jury's verdict in this case depended largely on the credibility of witnesses. It then goes on to state that

---

26. Rule 608(a) provides in part:

Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations; (1) the evidence may refer only to character for truthfulness or untruthfulness....

27. This line of questioning took place during the cross-examination of Blackketter after the attorney for Bruscino called Blackketter to the stand in order to testify regarding evidence he had collected tending to verify Fay's version of the events of the night of October 30, 1978. Blackketter had previously been called as a witness in the government's case in chief. At that time he had testified regarding the physical evidence found at the scene of the crime.

28. Defendants contend that because they did not learn of the actual sentence imposed upon Howell until after the jury rendered its verdict, they were denied their Sixth Amendment right to cross-examine the primary witness against them. We assume that they will use this information in attempting to impeach Howell should he testify at defendant's retrial.

Finally, we have examined Kell's arguments as to the allegedly prejudicial comments made by the prosecutor during closing argument and find these comments to be without merit.

Trial Exhibit 1 "could easily have biased the jury against Bruscino's credibility." *Ante* at p. 458. However, the document at issue did not impair Bruscino's credibility. If anything, it enhanced it. The document exonerated Bruscino from the suspicion that he was a member of the "Mexican Mafia."

I also do not agree with the majority's finding that Trial Exhibit 1 "could also have supplied the jurors with a more credible motive for the murder * * *." *Ante* at p. 459. In my opinion, any motive which could have been inferred from the document would have been no more plausible than that supplied by the government.

Furthermore, it was Bruscino's attorney who precipitated the jury's exposure to the document. Bruscino's attorney brought Exhibit 1 to the courtroom, used it to cross-examine a witness, and then placed the document on the court's exhibit table. Bruscino's attorney was asked specifically at that time by the Assistant United States Attorney whether the defense wished to admit the document. Bruscino's attorney responded, "Not at this time." However, Bruscino's attorney failed to remove the document from the exhibit table. The defense engineered this scenario and it should not now be allowed to have a second bite at the apple because of its own negligence or design.

The second item viewed as requiring remand because of its exposure to jurors is a newspaper article which was brought to the courtroom by one of the jurors. Again, I do not believe that the district court abused its discretion in ruling that the presence of this article in the jury room did not create a reasonable possibility that the appellants were prejudiced thereby.

Firstly, as discussed *ante* p. 457, there is no evidence that any of the jurors besides the juror who brought the article to the courtroom even saw the extraneous material. The few jurors who remembered some discussion of the article remembered it only in connection with trying to figure out names. It hardly seems likely that such discussion "might have operated to the sub-stantial injury of the defendant[s]." *United States v. Thomas*, 463 F.2d 1061, 1065 (7th Cir. 1972), *citing United States v. Grady*, 185 F.2d 273, 275 (7th Cir. 1950).

Jurors cannot be expected to operate in a total vacuum. The issue of whether a defendant has been denied a fair trial by juror prejudice from exposure to extraneous material must turn on the particular circumstances of such exposure, viewed in the context of the trial as a whole. "The severity of the threat depends upon both the nature of the information so publicized and the degree of juror exposure to it." *United States v. Thomas*, 463 F.2d at 1063. In my opinion, the threat of significant prejudice in this case is not clear enough to warrant a finding that the district court abused its discretion in ruling that a new trial was not called for under these circumstances. I would affirm the convictions.