[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10040
_____

D.C. Docket No. 5:12-cr-00009-RS-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BLAINE JOHNSTON,
WILSON CALLE,
WILFREDO RODRIGUEZ,
ANGEL DONE,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(August 26, 2015)

Before WILSON and ANDERSON, Circuit Judges, and VOORHEES,[*] District
Judge.

_____

[*] Honorable Richard Voorhees, United States District Judge for the Western District of
North Carolina, sitting by designation.

PER CURIAM:

On April 19, 2012, a federal grand jury returned a 54-count Bill of Indictment against Defendants-appellants Evelyn Johnston, Blaine Johnston, Hector Cabrera, Diana Gonzalez, Angel Done, Wilson Calle, and Wilfredo Rodriguez (collectively, Appellants).[1]  Count One of the Bill of Indictment alleged that between October 1, 2008, and October 27, 2009, Appellants conspired to defraud the Government by helping taxpayers obtain fraudulent tax refunds from the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 287.  Counts Two through Fifty-Four charged substantive violations of 18 U.S.C. §§ 287 and 2 based upon specific instances of fraudulent filings made by Appellants personally, or with the assistance of one or more of the Appellants.  Gonzalez pled guilty to Count One four days into the Government's case-in-chief.  Following nine days of trial, Johnston, Calle, and Done were convicted of the conspiracy offense charged in Count One, as well as all substantive offenses.  Rodriguez was acquitted of Count One but convicted of Count Fifty-Four (the only substantive count against him) based upon filing his own fraudulent return.  All Appellants contend that on day four of the trial, after announcing to the jury that co-defendant Diana Gonzalez tendered a guilty plea to the conspiracy charge, the trial judge abused his discretion

---

[1]  Evelyn Johnston is deceased.  The charges against her were dismissed on April 26, 2013, following her death.  In addition, the charges against Hector Cabrera were dismissed without prejudice by the United States prior to commencement of trial due to health concerns.

in denying their joint motion for mistrial.  Rodriguez and Calle assert that the district court abused its discretion in denying their respective Rule 29 motions. Johnston, Done, and Calle contend the district court committed clear error in applying the two-level "sophisticated means" enhancement pursuant to USSG § 2B1.1(b)(10)(C).  Done and Calle also contend it was clear error for the district court to rely on the conspiracy's overall intended loss rather than the actual loss for purposes of calculating the advisory guideline range, under USSG § 2B1.1(b)(1)(K).  Calle contends the district court committed clear error in declining to apply a role reduction pursuant to USSG § 3B1.2(a).  For the reasons set forth below, we affirm on all issues.

I.

The tax fraud scheme charged in the Bill of Indictment was premised on what is known as "redemption theory," which holds that "individuals are not responsible for their common personal debt obligations such as home mortgages, loans, credit card bills, and lines of credit, and may instead seek money from the IRS . . . to repay [or redeem] these outstanding obligations."  One explanation of this "redemption theory" holds forth as follows:

> [W]hen the United States went off the gold standard in 1933, the
> United States converted its citizenship to capital, and . . . secret bank
> accounts were opened at the Treasury, and through various imagined

> means were producing bonds that would allow you to redeem money from these secret bank accounts.

Promotors of this scheme advised taxpayers that by filing an IRS Form 1099-OID (Original Issue Discount), they could make a claim with the U.S. Treasury Department (Treasury) for satisfaction of personal debt.[2]  Described by the United States as "one of the latest reincarnations of the "straw man" scheme," the operation became known to the IRS as the "1099-OID scheme."

The jury trial for Appellants Blaine Johnston, Diana Gonzalez, Angel Done, Wilson Calle, and Wilfredo Rodriguez was held from September 9, 2013 through September 19, 2013. The Government's evidence established that persons experiencing difficulty paying their mortgages and other debts were targeted and actively solicited by members of the scheme.  Consistent with the above-described "redemption theory," prospects were told that the federal government was sponsoring a program that would enable an individual to have his or her mortgage paid by the Treasury.  The 1099-OIDs in this case contained creditor-specific information such as the institution's federal taxpayer identification number and actual business address, which made it appear that the financial institution submitted the document.  The 1099-OIDs reported a taxpayer's personal debt

---

[2]  Original Issue Discount refers to the difference between the price for which a debt instrument is issued and the stated redemption price at maturity and this difference, or interest, is typically included in a taxpayer's yearly income as it accrues over the term of the instrument. There are legitimate financial transactions that require generation of a 1099-OID form such as when a financial institution reports interest owed or paid.

obligation as income and a similar amount as withheld.  Oftentimes, the withholding amount was either ninety-nine percent of the reported "income" or five dollars less.  Once the 1099-OID was in the hands of the IRS, the personal tax return reporting the same income and corresponding withholding figure was submitted.  Significantly, this was a two-step process that required each individual filer to verify that the claim and information submitted was, in fact, true and accurate. Routinely, a standard form letter was also sent by the taxpayer to the IRS Fraud Department purporting to seek guidance as to the propriety of the submission.

All of the Appellants except Johnston had some level of involvement in a predecessor debt elimination scheme developed by a business called Mid-Atlantic Trustees and Administrators (MATA).  MATA manufactured and sent false and fraudulent bonds on behalf of its clients to the U.S. Treasury and touted those bonds as a means of satisfying individual debt.  MATA suggested that its clients could become "bonded" and draw upon their bonds to discharge various forms of debt.  The bond scheme was costly and largely unsuccessful.  Appellants Done, Calle, Gonzalez, and Rodriguez, as well as other participants, turned to the 1099-OID as an alternative means to eliminate their respective debts.

As the 1099-OID scheme grew, operations developed in the states of Florida and New York.  Done, who resided in New York and was a long-time

5

acquaintance of Appellant Calle, opened up his home for 1099-OID scheme webinars, spoke or taught at seminars promoting the scheme, and recruited individuals from New York and New Jersey. Done filed a fraudulent individual tax return and 1099-OID for the year 2008. Done was later provided formal notice (referred to as a "3175 letter") from the IRS that his use of the 1099-OID and claim for refund was unlawful.

Calle, who also resided in New York, met Gonzalez and Rodriguez at one of the 1099-OID seminars. At some point, Calle learned about ABACO Executive Services (ABACO), a tax preparation entity then owned and operated by Evelyn and Blaine Johnston. Calle learned that Evelyn Johnston was an "IRS enrolled agent."[3] Calle subsequently met with Evelyn Johnston in ABACO's Fort Lauderdale office, and hired ABACO to submit his tax documents including the 1099-OID. Eventually, Calle became the "intermediary" or "point person" between the scheme's New York and Florida operations. Like Done, Calle filed a fraudulent individual tax return and 1099-OID for the year 2008 and assisted

---

[3] An enrolled agent is a person who has earned the privilege of representing taxpayers before the Internal Revenue Service by either passing a three-part comprehensive IRS test covering individual and business tax returns, or through experience as a former IRS employee. Enrolled agent status is the highest credential the IRS awards . . . . Enrolled agents, like attorneys and certified public accountants (CPAs) have unlimited practice rights. *See* INTERNAL REV. SERV., ENROLLED AGENT INFORMATION (Apr. 23, 2015)., http://www.irs.gov/Tax-Professionals/Enrolled-Agents/Enrolled-Agent-Information.

others in the same process.  Calle was never given a formal IRS notice that his 2008 tax return and 1099-OID was unlawful.[4]

Beginning in October 2008, ABACO began to submit fraudulent returns for a $500 per person fee.  ABACO maintained two office locations in Florida, one in Fort Lauderdale and another in Panama City.  Once the necessary information was gathered and compiled, the materials were submitted to the ABACO Panama City office for preparation and filing.  ABACO was the common denominator since all of the fraudulent filings charged were submitted by ABACO.

Gonzalez, a native Cuban and Miami resident, had a prior business relationship with Rodriguez dating back to the fall of 1999.[5]  Gonzalez recruited prospects from the Miami area and assisted others in preparing and filing fraudulent tax returns and 1099-OIDs.  Gonzalez herself never filed an individual tax return or 1099-OID seeking a refund.

Rodriguez, also a native Cuban and Miami resident, reportedly learned of the 1099-OID scheme through independent research and then discussed it with Gonzalez.  In addition to his own research via the internet, Rodriguez subsequently

---

[4]  After submissions Calle made in connection with the predecessor bond scheme, Calle received a 3175 letter / notice in July 2008 alerting him that the IRS deemed that sort of debt elimination scheme troublesome.

[5]  Prior to his involvement in this scheme, Rodriguez partnered with Gonzalez in another venture, a gold mining development project in Honduras called Montana Pijol.  Gonzalez was the Executive Director of the project and Rodriguez was one of its biggest investors.  In addition, Gonzalez recruited Rodriguez to participate in the MATA bond scheme.

7

attended a portion of a seminar led by Appellant Done in Miami. Aside from these events, Rodriguez had little or no interaction with his co-defendants. Although Rodriguez had been exposed to other debt elimination schemes, he was not a recruiter and did not aid or abet anybody else in filing a fraudulent return or 1099-OID. Rather, Rodriguez obtained all of the necessary forms and most of his instructions for filing from chat groups on the internet. Rodriguez personally filed a fraudulent tax return and 1099-OID for tax year 2008 and was paid a refund in the amount of $311,000 which he later used to satisfy several personal debt obligations. One of the overt acts charged in furtherance of the conspiracy was the movement of approximately $310,000 of his refund immediately upon receipt, allegedly at the direction of Evelyn Johnston, in violation of 18 U.S.C. § 286. Rodriguez paid Gonzalez $10,000 of the $311,000 refund and testified that the money was a gift to Gonzalez to enable her to have some dental work done.

Of the sixty-three total fraudulent returns filed in conjunction with this scheme, twelve originated in New York and fifty-one in Florida. If fully successful, the total loss would have been $19,027,049. However, only four of these fraudulent filings resulted in issuance of refunds, limiting the actual total loss to $489,248.

At trial, Appellants Johnston, Done, and Rodriguez testified in their own defense. Appellant Calle elected not to testify. Appellants asserted a good faith

8

defense and proclaimed ignorance that their submission of the 1099-OID form in this manner was illegal. According to the defense, the 1099-OID process appeared legitimate based upon the willingness of Evelyn Johnston, as an IRS enrolled agent, to submit these filings through ABACO, and due to the circumstances surrounding the live seminars that lent the pitch an aura of credibility. Specifically, Appellants pointed to the fact that the seminars were held at reputable facilities and locations, were well-attended, and offered high caliber, educated speakers.

On the fourth day of the trial, a Thursday, Diana Gonzalez tendered a guilty plea to Count One of the Indictment.[6] Without consulting with counsel, the trial judge announced to the jury:

> You all have been locked away. I apologize for the delay but we had to first deal with another matter, and one of those other matters is that defendant Diana M. Gonzalez, pursuant to an agreement with the Government, pled guilty to Count One, and she is no longer on trial.

Thus, the jury was explicitly advised that Gonzalez elected to plead guilty to Count One, the conspiracy offense. Counsel voiced no contemporaneous objection. Nor did counsel request contemporaneously that a limiting instruction be given.[7]

---

[6] Gonzalez originally appealed her sentence but subsequently moved for a voluntarily dismissal of her appeal with prejudice, which was granted by this Court on February 20, 2014.

[7] Reportedly, prior to the district court's announcement, defense counsel had agreed amongst themselves that nothing should be said to the jury about Gonzalez's absence and then relayed the consensus to the prosecutor.

The following Monday, on the sixth day of trial, defense counsel jointly moved for a mistrial based upon the district judge's decision to explain Gonzalez's absence to the jury by advising that she pled guilty to the conspiracy count. The court denied the defense motion as untimely, but directed defense counsel to propose a curative instruction. The court advised counsel that, if requested, the curative instruction could be given twice − once in the midst of trial as soon as an instruction could be prepared and approved and again during the final jury charge. Defense counsel chose to have the court read the curative instruction only during the final instructions.

At the close of the Government's case-in-chief, all of the Defendants moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The motions were denied in that instance and upon renewal at the conclusion of all evidence.

The jury convicted all of the Defendants as charged, with one exception. While convicted of the only substantive offense with which he was charged, Rodriguez was acquitted on the conspiracy offense charged in Count One.

## II.

We review a District Court's decision not to grant a mistrial for abuse of discretion. *United States v. Capers*, 708 F.3d 1286, 1298 (11th Cir. 2013) (citing

*United States v. Emmanuel*, 565 F.3d 1324, 1334 (11th Cir. 2009) (emphasis added)).

"A mistrial should be granted if the defendant's substantial rights are prejudicially affected. This occurs when there is a reasonable probability that, but for the [alleged error], the outcome of the trial would have been different." *Capers*, 708 F.3d at 1298 (quoting *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007) (quotation marks omitted)). "[W]hen the record contains sufficient independent evidence of guilt, any error was harmless." *Id.*

"The decision to grant a mistrial is within the discretion of the trial judge since he is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *United States v. Saget*, 991 F.2d 702, 707–08 (11th Cir. 1993). "When a curative instruction has been given to address some improper and prejudicial evidence, we will reverse [the denial of a motion for a mistrial] only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Harriston*, 329 F.3d 779, 787 n.4 (11th Cir. 2003) (quotation marks omitted). "It is a basic tenet of our criminal jurisprudence that 'guilt or innocence must be determined one defendant at a time without regard to the disposition of charges against others.'" *United States v. Eason*, 920 F.2d 731, 738 (11th Cir. 1990) (quoting *United States v. Griffin*, 778 F.2d 707, 711 (11th Cir. 1985)).

With respect to a codefendant's guilty plea, the general rule is one of non-disclosure.  As previously held: "[T]here is no need to advise the jury or its perspective members that someone not in court, not on trial, and not to be tried, has pleaded guilty . . . [as] [t]he prejudice to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant is obvious." *Griffin*, 778 F.2d at 711 (internal citations omitted) (quoting *United States v. Hansen*, 544 F.2d 778, 780 (5th Cir. 1977)); *see also United States v. De La Vega*, 913 F.2d 861, 866 (11th Cir. 1990) ("The admission of guilty pleas . . . of co-defendants not subject to cross-examination is generally considered plain error."). "In a conspiracy trial, which by definition contemplates two or more culpable parties, courts must be especially vigilant to ensure that defendants are not convicted on the theory that guilty 'birds of a feather are flocked together.'" *Id.* (quoting *Krulewitch v. United States*, 336 U.S. 440, 454 (1949) (Jackson, J., concurring)); *see also United States v. Carrazana*, 921 F.2d 1557, 1568 (11th Cir. 1991); *United States v. DeLucca*, 630 F.2d 294, 298 (11th Cir. 1980) ("The problem of a defendant's guilt by association arises primarily when the jury learns of a codefendant's guilty plea entered either before or during the trial proceedings. A guilty plea entered by a codefendant can be especially prejudicial if the plea is made in connection with a conspiracy to which the remaining defendants are charged.").

An exception to the rule of nondisclosure occurs when a codefendant pleads guilty during the course of a trial. *Griffin*, 778 F.2d at 711 n.5. In that instance, "the trial court may comment that [a] codefendant[] ha[s] been excused from trial for legally sufficient reasons that should have no bearing on the remaining defendants' guilt or innocence." *Id.* (citing *United States v. Jones*, 425 F.2d 1048, 1053–54 (9th Cir. 1970).

Here, the trial court committed error when he instructed the jury that Gonzalez entered a guilty plea to the conspiracy offense charged in Count One. As a result, we are asked to determine whether incurable prejudice occurred such that a new trial is warranted. On these peculiar facts, we conclude that the error, although prejudicial, was not incurable and was, in fact, harmless in light of the curative instruction and the strength and nature of the government's evidence.

Consistent with defense counsel's belated request, during the final jury charge, the district judge provided the following instruction aimed at remedying his earlier statement to the jury about the Gonzalez plea:

> I told you last week that Diana Gonzalez is no longer a participant in the trial because she had pled guilty to a charge. I also instruct you that you must completely disregard what I said at that time about Diana Gonzalez, and you must not consider what I said about Diana Gonzalez's plea for any reason in reaching your verdict for any of the other defendants.
>
> Now the fact that a codefendant has pled guilty cannot be considered as evidence of the guilt of any remaining defendant.

13

The court's limiting instruction, clear and direct, was consistent with other instructions given by the Court.[8] "We presume the jury followed the district court's instructions and did not concern itself further with [Gonzalez's] absence or the charges against [Gonzalez]." *United States v. Layne*, No. 07-11427, 259 Fed. App'x. 183, 187, 2007 WL 4335880 (11th Cir. Dec. 12, 2007) (denying motion for mistrial after co-defendant's sudden absence during wire fraud conspiracy trial due to suicide; cautionary instructions were given at outset of first day of court with co-defendant's absence and again the following day directing the jury that the charges against the absent co-defendant were no longer before them and that they should not speculate about the development) (citing *United States v. Shenberg*, 89 F.3d 1461, 1472 (11th Cir. 1996)).

"In the absence of aggravated circumstances, a cautionary instruction directing the jury not to consider a guilty plea as substantive evidence of guilt will sufficiently cure any potential for prejudice to the defendant on trial." *Carrazana*, 921 F.2d at 1568 (conviction upheld on plain error review where six of eight co-defendants pleaded guilty after seven days of trial and jury was advised, at defense counsel's request, that they should not consider the co-defendants' guilty pleas as substantive evidence against remaining two defendants) (citing *United States v.*

---

[8] In preliminary instructions read at the outset of the trial, the judge explained that the evidence should be considered separately with respect to each defendant on trial. Likewise, in his final charge, the judge reiterated his instruction concerning the importance of the jury rendering an individualized verdict as to each defendant.

*King*, 505 F.2d 602, 608 (5th Cir. 1974) and *United States v. Baete*, 414 F.2d 782, 783–84 (5th Cir. 1969)); *see also De La Vega*, 913 F.2d at 866−67 (curative instruction two days later adequately addressed statements from witness that a co-conspirator had been separately tried and convicted);*DeLucca*, 630 F.2d at  299 (recognizing "immediate jury instructions" as a mechanism for curing improper disclosure of co-defendant's guilty plea).[9]

Because a curative instruction was given, albeit not contemporaneously at Appellants' behest, we next consider whether aggravating circumstances exist that require a new trial.  *See Baete*, 414 F.2d at 783−84 ("there may be aggravated circumstances in which the strongest corrective instruction would be insufficient, as, for example, where the guilty plea of one codefendant necessarily implicates another or others").  With respect to aggravating circumstances, relevant factors may include:

> The presence or absence of (a limiting) instruction . . . [,] whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, whether the introduction of the plea was invited by the defense counsel, whether an objection was entered or an instruction requested, [and] whether the defendant's failure to object could have been the result of tactical considerations.

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the Fifth Circuit decided before October 1, 1981.

15

*United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir. 1976).  To the extent the factors identified in *Fleetwood* have not already been discussed, we consider each in turn.

In this instance, the trial judge acted with a proper purpose in sharing the Gonzalez guilty plea to the jury – to explain her absence.   By day four of the government's evidence, the jurors had become accustomed to seeing Gonzalez seated at the defense table with the co-defendants.  As noted, *supra*, an exception to non-disclosure exists where it is necessary to explain the absence of a co-defendant during the pendency of trial.  *See Griffin*, 778 F.2d at 711 n.5 (internal citations omitted).  The curative instruction here accomplished that objective.  In addition, the Gonzalez guilty plea was not improperly emphasized during the remainder of the trial.  Aside from the trial judge's pronouncement, Appellants fail to identify *any* reference to the Gonzalez plea during the remainder of the trial and likewise do not suggest that the prosecution took advantage of the trial court's disclosure.[10]  Moreover, there is no indication the jury treated the Gonzalez guilty plea as substantive evidence of Appellants' guilt.  Rather, the acquittal of Rodriguez on Count One tends to show that the jurors took their tasks seriously and were fully capable of evaluating the evidence with respect to each defendant

---

[10]  There were passing references, innocuous in effect, to the Gonzalez guilty plea in closing arguments by both the prosecutor and certain defense counsel.

16

individually. As previously explained, the introduction of the Gonzalez plea was not invited by defense counsel. Significantly, that defense counsel declined to voice an objection or move for a mistrial immediately upon the judge's disclosure tends to show at least an ambivalence toward the need for a forceful approach to address the issue.[11]  While defense counsel's delayed response may have had some tactical underpinnings, the deferred reaction points toward an absence of undue prejudice.

Appellants insist that a curative instruction "could not unring the bell" following the trial court's disclosure.  Appellants urge us to hold that the error was not harmless because all of the Appellants, Gonzalez included, asserted a common good faith defense and aligned themselves with one another at the outset of trial. Indeed, the fact that the jury was advised not only that Gonzalez pled guilty, but that *she pled to Count One − the conspiracy offense −* gives rise to prejudice of potentially greater import than if the jury had learned about a guilty plea generally or a plea to a substantive offense charging only Gonzalez.[12]

---

[11]  The parties debate the timeliness of Appellants' objection and motion for new trial. However, because the error was plain under our precedent, *De La Vega*, 913 F.3d at 866, the timeliness of the defense objection and motion for mistrial is not dispositive.

[12]  This argument carries the most force with respect to Rodriguez. Rodriguez's argument is more appealing on its face given the evidence establishing the pre-existing business relationship between Gonzalez and Rodriguez and the fact that Rodriguez paid Gonzalez a portion of the fraudulent refund he received from the IRS.

Appellants rely on *United States v. Vaughn* in support of their position that advising the jury of the Gonzalez plea was tantamount to conceding that a conspiracy existed.  546 F.2d 47 (5th Cir. 1977) (disclosure of co-conspirator's guilty plea deemed to be incurable error).  *Vaughn*, however, is readily distinguishable in that both the nature of the fraud here, and the strength of the Government's evidence, set the 1099-OID prosecution apart.[13]  The *Vaughn* prosecution alleged a conspiracy to import marijuana into the United States from Jamaica and was based entirely upon the self-serving information volunteered by a co-conspirator / informant, William Mize, after Mize and his wife were caught red-handed smuggling 5,600 pounds of marijuana. *Vaughn*, 546 F.2d at 48−49. At the time, Mize was facing six felony charges in Illinois federal court and was deemed to be in violation of his conditions of release. *Id.*  Prior to Mize's bond violation, and before Mize's "confession," there had been no investigation conducted by law enforcement and no physical evidence of the conspiracy to import marijuana asserted by Mize against Vaughn and the other purported co-conspirators.  *Id*. at 49−50.

---

[13]  Before the *Vaughn* trial had begun, the trial judge unnecessarily advised the array of jurors that multiple co-defendants charged in the same indictment had already pled guilty. *Vaughn*, 546 F.2d at 49−50. The trial judge followed up with a warning that the guilty pleas should not be held against the remaining co-conspirators on trial. *Id*. at 50. The convictions were vacated and a new trial ordered despite the contemporaneous limiting instruction. *Id*. at 51. The panel found that by disclosing the guilty pleas of multiple co-conspirators similarly charged, the trial judge "solemnly confess[ed] the existence of the conspiracy and their [co-defendants'] participation in it." *Id*. at 49.

18

We can reasonably infer from the jury's verdict that the good faith defense, an alliance shared among the co-defendants, was not as compelling as Appellants argue, given that Rodriguez, Gonzalez's closest ally, was acquitted of the conspiracy charge.  Most importantly, given the nonsensical fallacy that fueled the 1099-OID scheme, and the intricate lengths to which the Appellants went to promote it and follow through with the execution of sequential filings with the IRS, we are confident in our view that disclosure of the Gonzalez plea held no sway with the jury in reaching its verdict.   Under different facts – had the scheme been less preposterous or the Government's evidence less compelling − we might have come to the view that the interests of justice weigh in favor of a new trial.  Such is not the case here.  As one of defense counsel conceded at sentencing, the scheme was "pie in the sky" such that the average person would easily recognize that the scheme was "probably not legitimate."  For these reasons, we hold that Appellants' substantial rights were not affected and a new trial is not required.

## III.

Next, we turn to the sufficiency of the evidence claims of Rodriguez and Calle.  When properly preserved, we review a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal *de novo*.  *See Capers*, 708 F.3d at 1296−97; *United States v. Kottwitz*, 614 F.3d 1241, 1264 (11th Cir. 2010), *withdrawn in part on other grounds*, 627 F.3d 1383 (11th Cir. 2010)

19

(citations omitted).  Sufficiency of the evidence claims raised for the first time on appeal are reviewed for plain error.  *See United States v. Olano*, 507 U.S. 725, 731−32 (1993); *see also United States v. Hunerlach*, 197 F.3d 1059, 1068−69 (11th Cir. 1999) (plain error review applies to a specific sufficiency of the evidence claim not previously raised – even where general sufficiency of the evidence challenge was made in connection with Rule 29 motion).

Upon a defense motion, or on its own motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  A conviction is supported by sufficient evidence if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In evaluating the sufficiency of the evidence, "[w]e consider the evidence in the light most favorable to the Government, making all reasonable inferences and credibility choices in the Government's favor, and then determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt."  *Capers*, 708 F.3d at 1296−97; *Kottwitz*, 614 F.3d at 1264 (internal citations and quotations omitted).

In this instance, both of the sufficiency of the evidence challenges raised on appeal by Rodriguez and Calle are subject to plain error review because the

20

specifics of their respective arguments were not raised before the trial court. We hold that Appellants' claims fail under a *de novo* review.

Rodriguez asks this Court to vacate his conviction on Count 54 due to insufficiency of the evidence regarding intent to violate the law. More specifically, Rodriguez asserts for the first time on appeal that the Government did not present any substantive corroborative evidence to support the element of intent for purposes of 18 U.S.C. § 287 − that Rodriguez acted knowingly.[14] According to Rodriguez, in light of Rodriguez's testimony that *at the time he filed his IRS return*, he did not understand that it was false and fraudulent, the Government's evidence was insufficient, as a matter of law, to satisfy a reasonable jury beyond a reasonable doubt of his criminal intent. *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (where some corroborative evidence exists for the charged offense, otherwise insufficient evidence can be made sufficient by a defendant's choice to testify, because the opposite of the defendant's testimony can be viewed as additional substantive evidence to bolster the corroborative evidence).

---

[14] Count 54 charges violation of 18 U.S.C. § 287 and alleges presentation of false, fictitious or fraudulent claims:

"Whoever makes or presents . . . any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title."

18 U.S.C. § 287.

Rodriguez appears to suggest that direct evidence of his intent is required to sustain the conviction.

In presenting the question of Rodriguez's intent to the jury, the Court began by defining the terms "knowingly" and "willfully." The jury was instructed that if it found that any defendant acted with a good faith belief that his conduct complied with the law, then that would mean that the Defendant could not have acted willfully. The Court explained:

> A defendant does not have to act willfully if that defendant believes, in good faith, that he is acting within the law or that his actions comply with the law. This is so even if the defendant's belief was not objectively reasonable, so long as the defendant held that belief in good faith. Nevertheless, you may consider whether the defendant's belief about the tax statutes was actually reasonable as a factor in deciding whether the defendant held that belief in good faith.
> The reasonableness of a belief is a fact – factor for you, the jury, to consider in determining whether a defendant actually held a belief and acted upon it. The more farfetched a belief is, the less likely it is that a person actually held or would act upon that belief. A defendant who knows what the law is and who disagrees with it does not have a bona fide misunderstanding defense.

Good faith was described as having "an honest intention, an absence of malice, and an honest intention to abstain from taking any unconscientious advantage of another."

The jurors were also instructed that ignorance of the law or mistake of the law is not a defense to criminal prosecution. The jurors were told that disagreement with the law is not a defense. Significantly, the jurors were

22

instructed on willful blindness and the inference of knowledge that may be drawn from a defendant apparently deliberately closing his eyes to what would otherwise have been obvious.

In his trial testimony, Rodriguez had an opportunity to explain his motives and elaborate on the reasonableness of his purported good faith belief. Rodriguez was able to explain to the jury how he came to believe that the 1099-OID was a lawful mechanism for seeking to have the IRS redeem his personal debt obligations. Rodriguez testified:

> I was convinced hundred percent that this was legal. Based on my research on Internet, people were doing for years, people were receiving checks, and I saw was legal, legitimate.

Rodriguez also told the jury about his discussions with his accountants; how one of his accountants, Louis Cast, told Rodriguez that there were numerous "loopholes" in the tax code and advised consequently that he could not opine on the legality of the 1099-OIDs for this purpose. Rodriguez testified that as long as he correctly identified the actual debt amounts, it was his understanding that use of the 1099-OIDs to pursue a refund from the IRS was permissible. Rodriguez testified that *in 2008* he was of the view that his actions were, in fact, lawful and that he had no reason to think otherwise.[15] In the end, the jury did not find Rodriguez's good faith

---

[15] According to Appellants, neither Rodriguez nor Calle received any correspondence directly from the IRS warning them about the unlawfulness of their actions prior to submitting their individual tax returns and IRS 1099-OIDs. Rodriguez also made it clear in his testimony

claim credible. One readily infers that the jury rejected the "good faith" defense theory and found that good faith did not excuse any of the defendants on trial. Viewing all of the evidence in the light most favorable to the Government, making all reasonable inferences and credibility choices in the Government's favor, a reasonable jury could have found Rodriguez guilty of Count 54. Because the jury's verdict was supported by sufficient evidence, as recited *supra*, Rodriguez's Rule 29 motion was properly denied.

B.

Similarly, Calle's sufficiency of the evidence challenge to two of his § 287 convictions was also properly denied. With respect to Counts 48 and 51, Calle contends there was insufficient evidence of aiding and abetting, and insufficient evidence that refunds based on the pertinent filings included "false or fraudulent material facts."[16] Counts 48 and 51 are based upon individual filings made by Sandra Genere (Count 48) and Juan Puello and Maria E. Jiminez De Puello (Count 51) and Calle's alleged aiding and abetting. The Genere and Puello returns were

_____

that he was never provided an opportunity to pay the money back to the IRS before being charged criminally.

[16] Aiding and abetting was also charged in connection with each substantive offense brought pursuant to 18 U.S.C. § 287. Title 18 United States Code, Section 2 provides in part that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

24

discovered during execution of a search warrant at ABACO's Panama City office by law enforcement.

Calle first contends although Genere was from New York, there was no evidence that Genere was associated with the New York Group that he coordinated. The Government's evidence showed that Genere was indeed from New York, that Genere attended one of the 1099-OID seminars, and used ABACO to prepare and file her tax return. In addition, an ABACO employee testified that over the course of the conspiracy, all of the 1099-OID filings were received in FedEx packets from either Miami or New York. The same employee testified that Calle was his contact person for New York filings and that when packets were received from New York, the documents sent, including those at issue in Counts 48 and 51, were already prepared and ready for filing.

Calle further contends that in both of these instances, the Government failed to produce evidence that the Genere and Puello returns were fraudulent or false. While it is not entirely clear, Calle appears to contend that the documentary evidence, *i.e.*, the tax returns and 1099-OID forms themselves, is insufficient to establish that the filings were fraudulent or false. We disagree. Given the trial evidence as a whole, a reasonable jury, properly relying on common sense, could find beyond a reasonable doubt that the refunds sought by Genere and Puello were false and fraudulent based solely upon the documents. The Genere tax return for

25

2008 reported that First Financial Equities, Inc., paid Genere $128,000, and withheld $127,990, resulting in a net refund of $103,520 to Genere.  As for the Puello tax return for 2008, it reported that First Residential Mortgage Services Corporation paid the taxpayers $405,000, withheld $404,990, resulting in a net refund of $302,265 to the Puellos.  We conclude that, viewing the evidence as a whole in the light most favorable to the Government, and drawing all reasonable inferences from the evidence, a jury could reasonably conclude beyond a reasonable doubt that the types of filings at issue here (a tax return and corresponding 1099-OID claiming entitlement to a refund for an actual debt owed) is, in fact, fraudulent and false.  We affirm the district court on the denial of the Rule 29 motions for judgment of acquittal.

## IV.

Finally, Johnston, Done, and Calle challenge their 78-month sentences on multiple grounds.  Appellants first argue that the district court clearly erred in applying a two-level sophisticated-means enhancement; Done and Calle argue that the district court plainly erred in calculating the loss amount attributable to them by using intended loss for the entire conspiracy instead of only the portion derived from New York participants; Done argues that the district court clearly erred in calculating the loss amount by using intended loss instead of actual loss, or

alternatively imposed a substantively unreasonable sentence by sentencing within the guideline range resulting from the use of intended loss, because the intended loss amount substantially overstated the seriousness of the offense; and Calle argues that the district court clearly erred in declining to apply a role reduction.

We review alleged sentencing errors involving interpretation of the U.S. Sentencing Guidelines *de novo* and factual findings for clear error. *See United States v. Barner*, 572 F.3d 1239, 1247 (11th Cir. 2009). Sentencing matters not raised before the district court are reviewed for plain error.[17] *See United States v. Jones*, 743 F.3d 826, 828 (11th Cir. 2014). The procedural reasonableness of a sentence is reviewed for an abuse of discretion. *See United States v. Elisor*, 522 F.3d 1255, 1273 n. 25 (11th Cir. 2008).

Failure to object to allegations of fact in a Presentence Investigation Report admits those facts for sentencing purposes. *See United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006).

A.

Appellants Johnston, Done, and Calle contend that application of the "sophisticated means" enhancement pursuant to pursuant to U.S.S.G. §

---

[17] Under plain-error review, we may correct an error where (1) an error occurred; (2) the error was plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732−736 (1993).

2B1.1(b)(10)(C) was incorrect.  We review the district court's factual finding that the 1099-OID scheme warranted a "sophisticated means" enhancement for clear error.  *See United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).

"The Guidelines provide for a two-level enhancement if the offense in question involved sophisticated means." *Ghertler*, 605 F.3d at 1267 (internal citations and quotation marks omitted) (applying earlier version of guidelines; citing U.S.S.G. § 2B1.1(b)(9)(C); U.S.S.G. § 2B1.1(b)(10)(C)). "Sophisticated means refers to especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense, and ordinarily includes [c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. § 2B1.1 cmt. n.9 (B). "There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated." *Gertler*, 605 F.3d at 1267..  Moreover, it is the nature of the scheme itself, as opposed to a defendant's individual role, that determines whether the sophisticated means enhancement applies.  *See id.*

As an initial matter, none of the Appellants objected to the offense conduct described in the PSI that applied to the scheme as a whole. Rather, Johnston, Done, and Calle each objected to various aspects of the PSI on the basis that there was no evidence that they *individually* engaged in particular conduct.  Therefore, under

28

*Wade*, the PSI's description of the scheme as a whole was admitted for sentencing

purposes.[18] *See Wade*, 458 F.3d at 1277.  We begin our analysis there.

In *Ghertler*, we upheld application of a sophisticated-means enhancement

although aspects of the scheme were not sophisticated, and the defendant

sometimes made little or no effort to conceal the fact of his fraud or his identity.

605 F.3d at 1267−68.  Looking to the scheme as a whole, we noted that the

defendant conducted extensive research on victim companies, forged false

documents, and used third parties to try to conceal his proceeds.  *Id*. at 1268.

Noting it was a "close question," we nonetheless concluded that defendant's

activities considered *in toto* were sufficient to support the enhancement. *Id*.; *see*

*also United States v. Bane*, 720 F.3d 818, 826−27 (l lth Cir.), *cert. denied*, 134 S.

Ct. 835 (2013) (upholding sophisticated-means enhancement where the offense

involved multiple corporations, repetitive coordinated conduct-including stamping

documents to create the illusion that an independent entity issued them-and steps to

conceal the offense).

Here, the district court did not clearly err in determining that the 1099-OID

scheme involved the use of sophisticated means.  This was a multi-state operation

---

[18]  For example, although Done contests on appeal that the defendants made it appear that
the creditors or financial institutions issued or *filed* the 1099-OID forms themselves, he failed to
object to the PSI's factual statement that the defendants made it appear that such entities issued
the forms, and this fact partially demonstrated the scheme's sophistication.  *See Bane*, 720 F.3d
at 826−27; *Ghertler*, 605 F.3d at 1268.

that employed subterfuge and repetitive coordinated conduct. *See Bane*, 720 F.3d at 826−27. In terms of entities, the scheme involved a set of recruiters in New York, a recruiter or set of recruiters in Miami, a tax preparation company in Panama City and Ft. Lauderdale, and individual participant-taxpayers. The two sets of recruiters communicated with each other, ABACO, and their individual participants. In terms of steps, (1) recruiters solicited individuals to join the scheme; (2) recruiters hosted seminars where they instructed participants on how the scheme worked; (3) recruiters and participants collected mortgage or loan documents and necessary information and completed the 1099-OID forms; (4) recruiters and / or ABACO created a checklist to gather necessary information and streamline the 1099-OID form process; (5) participants used ABACO to file their tax returns; and (6) a total of 63 fraudulent tax returns requesting $19,027,049 in refunds were filed.

Furthermore, the two critical steps of the 1099-OID scheme were coordinated and deliberate in sequence. The 1099-OID forms were submitted separately and in advance of the actual tax returns, which projected the illusion that the separate filings independently supported each other. Combined with the matching income and withholding figures, the tax return confirmed what was already before the IRS via the 1099-OID. In another step, presumably an attempt to set up a good faith or mistake of law defense, participants sent a standard form

letter to the IRS Fraud Department requesting that the IRS notify them if it was false or fraudulent to file the 1099-OID form.  In addition,  as evidenced  by the need  to  conduct  seminars  explaining the scheme, the concept  of the  1099-OID scheme itself is inherently  more  sophisticated  than  the standard  tax fraud, where one simply overstates withholdings  or understates  income.   *See* U.S.S.G. § 2Bl.1, cmt. n.9 (B).

Appellants' argument that the defendants made little or no attempt to hide their identities or their perpetration of the fraud is unavailing.  It is true that Appellants and scheme participants did not hide their identities; personal identifiers were necessary in order to request the fraudulent refund.  However, the movement of Rodriguez's refund, a coordinated effort to sequester the money after-the-fact, provides evidence aimed at concealment of the 1099-OID scheme. *See* U.S.S.G. § 2Bl.1, cmt. n. 9 (B).

Although any of these steps taken in isolation may not be sophisticated, the district court did not clearly err in concluding that, when together as a plan and executed repeatedly, these coordinated steps were especially sophisticated or intricate. *See Bane*, 720 F.3d at 826−827; *Ghertler*, 605 F.3d at 1267−68; *Clarke*, 562 F.3d at 1165.  Accordingly, we affirm on this issue.

## B.

31

We review the alleged errors raised by Appellants with respect to loss amount for plain error.[19]  *Jones*, 743 F.3d at 828.   Done and Calle contest the guidelines calculation based upon intended loss rather than actual loss.  According to the Appellants, the district court incorrectly calculated the guidelines by applying an enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(K), resulting in a 20-level increase for a loss amount exceeding $7,000,000 but not more than $20,000,000.

The Sentencing Guidelines apply a base offense level, and then increase the level based on the value of the loss caused. U.S.S.G. § 2B1.1(a), (b)(1). The sentencing court is required to make only a reasonable estimate of the loss suffered, and a "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." Id. § 2B1.1 cmt. n. 3(C). When a defendant challenges the attributed loss, the government must provide evidence to establish the loss, and the court must make factual findings sufficient to support its conclusions.  *See Liss*, 265 F.3d at 1230.

---

[19]  Calle concedes that this is the appropriate standard because he did not raise the issue below. As for Done, although he objected to the loss calculation in the district court, he raised no argument that his loss should be determined solely with reference to the New York participants, why the actions of the Miami participants were not part of his relevant conduct, or how the Miami and New York branches were independent.  Instead, he only argued that the loss figure overstated the seriousness of his role in the scheme and exceeded the actual loss by a factor of over 60, due to the transparently fraudulent nature of the scheme, and requested a loss figure based on his refund alone.  *See United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007) (stating that an objection is properly preserved where it is sufficient to apprise the district court and the opposing party of the particular grounds upon which appellate relief will later be sought, and is raised in such clear and simple language such that the district court may not misunderstand it).  Thus, we review this issue only for plain error as to both defendants.

The Sentencing Guidelines contemplate that *the greater of* actual or intended loss will drive the base offense level calculation. U.S.S.G. § 2B1.1 cmt. n.3 (A). Proper calculation requires consideration of all the acts and omissions that were part of the same scheme. *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir.), *cert. denied*, 135 S. Ct. 310 (2014). "A participant in a conspiracy may thus be held responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *Id*. (internal quotation marks omitted). Relevant conduct includes all acts and omissions committed by the defendant, as well as all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity. U.S.S.G. § 1Bl.3(a)(l)(A)−(B). To determine a defendant's accountability for the conduct of others, the court must first determine the scope of the criminal activity that he agreed to jointly undertake. *Id*. § 1Bl.3 cmt. n.2. The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is attributable to him as relevant conduct. *Id*.

The scope of a defendant's jointly undertaken criminal activity is not necessarily the same as the scope of the entire conspiracy. *Id.* The defendant's mere knowledge of the existence of a larger criminal undertaking and agreement to perform a particular act is insufficient to show that he agreed to participate in the entire criminal undertaking.  *United States v. Hunter*, 323 F.3d 1314, 1320 (11th

33

Cir. 2003). However, in determining the scope of the criminal activity the defendant agreed to undertake jointly, the district court may consider any implicit agreement fairly inferred from the conduct of the defendant and others.  U.S.S.G. § lBl.3, comment. (n.2). Sharing and mutuality are factors indicative of an agreement to participate in a larger criminal scheme. *See Hunter*, 323 F.3d at 1322. Other relevant factors are the extent of the defendant's knowledge of and participation in the undertaking, and whether the defendant took steps to further the scheme. *See United States v. McCrimmon*, 362 F.3d 725, 732−33 (11th Cir. 2004). Thus, we have held that the conduct of participants in a fraud scheme was part of a defendant's jointly undertaken criminal activity where the participants, although acting on their own behalf, were aware of each other's activities and aided and abetted one another by sharing lead sheets of potential victims and sharing telephones. *United States v. Hall*, 996 F.2d 284, 285−86 (11th Cir. 1993).

1.

The district court did not plainly err in attributing the actions of the Miami participants to Done as relevant conduct in calculating the intended loss amount. Done had extensive knowledge of the scheme and an important role in furthering it, as he recruited individuals to participate in the scheme, invited them to attend seminars he hosted, instructed participants on how the process worked, and helped

participants gather necessary information and complete forms. *See McCrimmon*, 362 F.3d at 732-33. Done's conduct also involved sharing and mutuality with the Miami branch, as he travelled to Miami to share information regarding the 1099-OID scheme with attendees, and the recruiter and contact person for the Miami group, Gonzalez, recruited participants for the 1099-0ID scheme and another IRS scheme at a seminar hosted by Done. *See Hunter*, 323 F.3d at 1322. In addition, correspondence between Done and Calle and the Miami recruiters was found at Abaco's office in Florida, and a large number of participant worksheets from the New York and Miami groups were found at Abaco's office, and some worksheets, including those from the New York group, listed Gonzalez as contact person. *See Hall*, 996 F.2d at 285−86.

From these facts, the district court could fairly infer that an implicit agreement existed between ( 1) Done and Calle, (2) Gonzalez and the Miami branch, and (3) Abaco and the Johnstons, thereby making the Miami returns part of the scope of Done's jointly undertaken criminal activity. See U.S.S.G. § lBl.3, comment. (n.2). In addition, given Done's role as a recruiter for the scheme and knowledge of the scheme, the tax refunds filed by the Miami branch were reasonably foreseeable by Done. *See* U.S.S.G. § lBl.3, cmt. n.2.

2.

35

The district court also did not plainly err in attributing the actions of the Miami participants to Calle as relevant conduct in calculating the intended loss amount. Calle recruited people in the New York area to join the scheme and served as a contact person and intermediary for the New York group and Abaco. Calle also failed to object to the PSI's statement that he was involved during the whole scheme. *See Wade*, 458 F.3d at 1277. Thus, Calle had substantial knowledge of the scheme and an important role in furthering it.  *See McCrimmon*, 362 F.3d at 732−33.  Again, correspondence between Done and Calle and the Miami recruiters was found at Abaco's office in Florida, and a large number of participant worksheets from the New York and Miami groups were found at Abaco's office, and some worksheets, including those from the New York group, listed Gonzalez as contact person.  *See Hall*, 996 F.2d at 285-86.

From these facts, the district court could fairly infer that an implicit agreement existed between (1) Calle and Done, (2) Gonzalez and the Miami branch, and (3) Abaco and the Johnstons, thereby making the Miami returns part of the scope of Calle's jointly undertaken criminal activity.  *See* U.S.S.G. § lBl.3 cmt. n.2. In addition, given Calle's important role as a recruiter and contact person and his extensive involvement with the scheme, the district court could find that the tax refund requests filed by the Miami branch were reasonably foreseeable by Calle. *See* U.S.S.G. § lBl.3 cmt. n.2.  Even if Calle's ties to the Miami branch were not as

36

strong as Done's ties, and even if the district court erred in attributing the conduct

of the Miami participants to Calle as relevant conduct, it did not plainly err. *See*

*Olano*, 507 U.S. at 734.

3.

We review a district court's loss calculation for clear error.  *United States v.*

*Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014).

We review the reasonableness of a sentence under a deferential abuse of

discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007).  We will reverse

if left with the firm conviction that the district court committed a clear error of

judgment in weighing the § 3553(a) factors by arriving at a sentence that lies

outside the range of reasonable sentences dictated by the facts of the case.  *United*

*States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc).

Loss for purposes of calculating the adjusted offense level pursuant to

U.S.S.G. § 2Bl.1(b) is the greater of the actual loss or intended loss. U.S.S.G. §

2B1.1, cmt. n.3 (A).  Intended loss is the "pecuniary harm that was intended to

result from the offense," even if the harm was "impossible or unlikely to occur."

*Rodriguez*, 751 F.3d at 1255; U.S.S.G. § 2Bl.1 cmt. n.3 (A)(ii).

Ordinarily, a defendant's sentence should reflect the nature and magnitude of the loss caused or intended by his crimes. *Id*. cmt. n.20. "Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level." *Id*. However, in cases in which the loss calculation substantially overstates the seriousness of the offense, a downward departure may be warranted. *See id*. cmt. n.20(C); *see also Campbell*, 765 F.3d at 1301.

The district court must impose a sentence "sufficient, but not greater than necessary to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. *See* 18 U.S.C. § 3553(a)(2). In imposing a particular sentence, the court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guideline range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. *Id*. § 3553(a)(1), (3)−(7). The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. *United States v. Clay*, 483

38

F.3d 739, 743 (11th Cir. 2007).  Although we do not automatically presume a sentence falling within the guideline range to be reasonable, we ordinarily expect such a sentence to be reasonable.  *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).

The district court did not clearly err in using intended loss in making its loss calculation, as intended loss ($19,027,049) was greater than actual loss ($489,248). *See* U.S.S.G. § 2B 1.1 cmt. n.3 (A). Although whether intended loss may have been impossible or unlikely to occur might impact the substantive reasonableness of Done' s sentence, it is not relevant for the loss calculation.  *See Rodriguez*, 751 F.3d at 1255; U.S.S.G. § 2Bl.l cmt. n.3 (A)(ii).

The district court did not abuse its discretion and impose a substantively unreasonable sentence. Done's sentence of 78 months imprisonment was at the low end of the advisory guideline range of 78 to 97 months, and we would ordinarily expect such a sentence to be reasonable. *See Hunt*, 526 F.3d at 746.

Although most of the $19 million intended loss figure that caused the higher guideline range was unlikely to be attained by the scheme's participants, a 78-month sentence reflected the seriousness of the offense and helped promote respect for the law, as the scheme involved a sophisticated, extensive, and coordinated scheme to defraud the government with significant intended and actual loss. *See* 18

39

U.S.C. § 3553(a)(l), (2)(A). Further, the sentence properly took Done's history and characteristics into account, as he had previously been convicted for participating in two tax schemes, and in the 1099-0ID scheme here Done recruited and apparently duped individuals who were desperate because of their financial condition. *See id.* § 3553(a)(l). The brazenness of the scheme should not result in a shorter sentence for Done, because the scheme appears to have been intentionally designed to avoid a finding of willful intent to defraud, as evidenced by the participants' devious and calculated submission of letters to the IRS fraud office notifying it of their actions and requesting that the IRS notify them if their actions were fraudulent.

4.

Calle also alleges that the guidelines were incorrectly calculated because the district court failed to apply a role reduction pursuant to U.S.S.G. § 3B1.2(a). There was evidence that at least one person (Jay Morales) who had previously been involved in the bond scheme was introduced to the 1099-OID scheme by Calle and Done. In addition, there was testimony that Calle was the go-to person in New York when questions arose; that Calle helped participants complete the information needed for the tax return and was responsible for sending the packets to ABACO for preparation and submission to the IRS.

40

This Court reviews for clear error the district court's determination of a defendant's role in the offense as a finding of fact. *United States v. De Varon*, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). "Where a fact pattern gives rise to two reasonable and different constructions, the factfinder's choice between them cannot be clearly erroneous." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012) (quotation omitted). The proponent of the downward adjustment bears the burden of proving a mitigating role by a preponderance of the evidence. *De Varon*, 175 F.3d at 939. In ruling on a proponent's request, the district court is not required to make any specific findings other than the ultimate determination of his role in the offense. *Id*. at 940.

A defendant may receive a four-level decrease in his base offense level if his role in the offense was minimal, a two-level decrease if his role was minor, and a three-level decrease if his role was somewhere in between. U.S.S.G. § 3B1.2. A minimal-participant adjustment is "intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group," and minimal participation may be indicated by a defendant's "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." *Id.* cmt. n.4. A minor-participant adjustment applies to a defendant who is "less culpable than most other participants, but whose role could not be described as minimal." *Id*. cmt. n.5.

41

To determine whether a defendant is entitled to a role reduction, a district court must consider his (1) "role in the relevant conduct for which he has been held accountable at sentencing" and (2) "role as compared to that of other participants in his relevant conduct." *De Varon*, 175 F.3d at 940. Under the first principle, the district court must measure the defendant's role against all of the relevant conduct that was attributed to him. *Id.* at 940−41. Regarding the second principle, the Sentencing Guidelines "clearly contemplate some assessment of relative culpability," but the district court should "look to other participants only to the extent that they are identifiable or discernable from the evidence." *Id.* at 944. Then, the district court "may consider only those participants who were involved in the relevant conduct attributed to the defendant." *Id*. The district court should determine whether the defendant was less culpable than were most other participants in the attributed conduct. *Id*. The fact that a defendant's role is less than other participants' roles in the relevant conduct may not be dispositive because it is possible that none of them are minor or minimal participants. *Id*.; *see also United States v. Zaccardi*, 924 F.2d 201, 203 (11th Cir. 1991) (stating that the fact that a particular defendant may be least culpable among those who are actually named as defendants does not establish that he performed a minor role in the conspiracy). In *United States v. Bernal-Benitez*, this Court held that the district court did not clearly err in concluding that one defendant's contribution of $3,000

and another defendant's contribution of $8,000 to a $35,000 drug buy (for shares of about 8.6 percent and 22.9 percent, respectively) constituted significant involvement with the conduct attributed to them, rendering a role reduction inappropriate.  594 F.3d 1303, 1321 (11th Cir. 2010).

Here, the district court did not clearly err in determining that Calle did not play a minor or minimal role in the scheme. First, Calle was not entitled to a minimal-role adjustment, as he had knowledge of the scope and structure of the scheme. *See* U.S.S.G. § 3Bl.2 cmt. n.4. Again, Calle failed to object to the PSI's statement that he was involved during the whole scheme.  *See Wade*, 458 F.3d at 1277.  Calle also concedes on appeal that he recruited people in the New York area to join the scheme and served as the contact person and intermediary for the New York group and ABACO.

Second, the district court's conclusion that Calle did not play a minor role in the scheme constituted a reasonable construction of the facts, and, thus, did not constitute clear error.  *See Almedina*, 686 F.3d at 1315. Again, Calle's role as a recruiter and contact person for one of the scheme's two groups was important. The scheme's New York participants filed 12 of the 63 total tax returns in the scheme, while the Miami group accounted for the other 51 returns.  In his brief, Calle estimates that the claimed refunds from the New York group represented 19 percent of the total amount claimed in the scheme. (See Blue Brief at 62-63). This

fact alone, however, was insufficient to establish that Calle was entitled to a role reduction. *See De Varon*, 175 F.3d at 944. Indeed, while the New York group's share (19 percent) did not represent a majority of the scheme, it constituted a comparable portion of the total amount involved as the defendants' shares (8.6 percent and 22.9 percent) in *Bernal-Benitez*, where this Court upheld the district court's refusal to grant a role reduction. *See* 594 F.3d at 1321. The PSI also established that (1) correspondence between Calle and Done and the Miami recruiters was found at Abaco's office in Florida, and (2) a large number of participant worksheets from the New York and Miami groups were found at Abaco's office, and some worksheets, including those from the New York group, listed Gonzalez as contact person. Therefore, the district court did not clearly err in concluding that Calle did not carry his burden to prove his entitlement to a role reduction by a preponderance of the evidence. *See De Varon*, 175 F.3d at 939.

Lastly, Calle's argument that the district court should have made more detailed findings in denying his request for a role reduction is unavailing, as the court was only required to make an ultimate determination as to his role in the offense. *See id.* at 940. Accordingly, we also affirm as to this issue.

**AFFIRMED**.

WILSON, Circuit Judge, dissenting in part:

Over the course of approximately one week, all four defendants were jointly tried for conspiring to defraud the United States by filing fraudulent tax returns. The four defendants all asserted a single, common defense, which was that each defendant believed in good faith that the conspiracy for which they were charged was, in fact, a legitimate enterprise. Co-defendant Gonzalez withdrew her not-guilty plea and admitted guilt on the fourth day of trial. The district court's uninvited and erroneous revelation to the jury that Gonzalez had admitted that she conspired to commit an act she knew to be illegal destroyed the concerted defense of the three remaining defendants. This error necessarily implicated the remaining defendants' guilt because it removed all reasonable doubt as to whether any two defendants knew that their operation was illegal.

Our precedent instructs that, where the guilty plea of one co-defendant necessarily implicates the guilt of another, the introduction of this evidence is harmful and prejudicial error. *See United States v. Baete*, 414 F.2d 782, 783–84 (5th Cir. 1969) (per curiam).[1] Given that these defendants were jointly tried for their alleged involvement in a conspiracy and raised a unified good faith defense that was, in my view, irreparably affected by the erroneous admission of

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981. Therefore, this court uses the term "we" to refer to both the former Fifth Circuit and the current Eleventh Circuit.

Gonzalez's guilty plea, I do not believe that the district court's cautionary instruction sufficiently cured beyond a reasonable doubt the prejudice suffered by the remaining defendants. *See id.*; *see also United States v. Vaughn*, 546 F.2d 47, 51 (5th Cir. 1977) (reversing and remanding after trial court's disclosure of co-conspirators' guilty pleas because "some things are too prejudicial to be cured by the strongest cautionary instruction"); *United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir. 1976) ("[I]n some instances information pertaining to the guilty pleas of others might so taint the trial of an individual that the error [cannot] be cured despite a cautionary instruction."). Thus, I would reverse and remand this case.

## I.

"Due to the extreme and unfair prejudice suffered by defendants in similar situations [that is, conspiracy cases], courts and prosecutors generally are forbidden from mentioning that a codefendant has either pled guilty or been convicted." *United States v. Griffin*, 778 F.2d 707, 710 (11th Cir. 1985). Accordingly, as the Majority concedes, the district court erred in revealing to the jury that Gonzalez—a co-defendant and alleged co-conspirator—pled guilty. To determine whether this error was prejudicial, we must look to "the facts and circumstances of the case in their proper context." *Fleetwood*, 528 F.2d at 532. Where the error is constitutional in nature, as an appellate court, we "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v.*

46

*California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967); *see also Fleetwood*, 528 F.2d at 536 (finding that the court's error in introducing co-conspirators' guilty pleas "was not harmless beyond a reasonable doubt").

A prompt curative instruction may be insufficient to cure the error if there are "aggravated circumstances." *See Baete*, 414 F.2d at 783–84. Aggravated circumstances exist when the revelation of the guilty plea necessarily implicates the guilt of a co-defendant. *Id*. The potential for prejudice—and the corresponding need for vigilant scrutiny in these circumstances—is heightened in conspiracy cases because conspiracy, by definition, "contemplates two or more culpable parties." *Griffin*, 778 F.2d at 711.

## II.

Looking to the facts and circumstances of this case, as our precedent instructs, I would find that aggravated circumstances exist that render this error—the district court's uninvited injection of alleged co-conspirator Gonzalez's guilty plea into the trial—incurable and harmful. Conspiracy, by definition, contemplates two or more parties agreeing to commit illegal acts. *See id.* In this case, the defendants were all charged with and jointly tried for the same conspiracy, and they even set forth a unified defense—that they did not know their enterprise was illegal (and thus did not agree to commit any illegal acts). The district court's revelation to the jury that co-defendant and alleged co-conspirator Gonzalez pled

47

guilty to the conspiracy effectively destroyed the remaining parties' unified good faith defense and necessarily implicated their guilt (i.e., their knowledge of the illegality of their enterprise).  This is clearly prejudicial and harmful.  *See id.* at 710 (noting that, when a trial court informs the jury of a co-defendant's guilty plea, "[t]he prejudice to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant is obvious" (internal quotation marks omitted)).

Of course, the Majority, while conceding that prejudicial error occurred, insists that the error is nevertheless harmless due to the district court's curative instruction and the "strength and nature" of the government's evidence.  But the existence of a curative instruction and the strength of the government's case against a defendant do not render this error harmless when aggravated circumstances exist.  *See Baete*, 414 F.2d at 783–84; *Fleetwood*, 528 F.2d at 535.  Implicit in our precedent is the general rule that when aggravated circumstances exist, by the very nature of those circumstances, a curative instruction may be insufficient to cure prejudicial error resulting from the disclosure of a co-defendant's guilty plea in a conspiracy.  *See, e.g.*, *Baete*, 414 F.2d at 783–84 (suggesting that, in the *absence* of aggravated circumstances, we may consider whether a curative instruction sufficiently cures any harm to the defendant).

48

Instead, the Majority's conclusion is rooted in those cases in which we have recognized exceptions to the general rule that this sort of error requires reversal. One such exception applies to situations where the error was invited by the defendant or was part of the defendant's deliberate trial strategy. *See United States v. Handly*, 591 F.2d 1125, 1130 (5th Cir. 1979) ("[P]rosecutors should avoid making improper references to the guilty pleas of coconspirators, for the potential prejudicial effect that such comments can have is tremendous, and the situation encountered in this case, *where defense counsel's independent choice to use that information in his trial strategy is obvious from the record and dispels the claim of prejudice*, would appear to be the exception rather than the rule." (emphasis added)); *United States v. King*, 505 F.2d at 608–09 (5th Cir. 1974) (finding no reversible error because the defense counsel "injected" the prejudicial evidence into the case and the testimony was restricted to informing the jury of the government witness's prior criminal background); *United States v. Carrazana*, 921 F.2d 1557, 1568 (11th Cir. 1991) (finding, in the absence of aggravated circumstances, cautionary instructions sufficed where the court advised the jury of the co-defendants' guilty pleas *at the request of and according to* an instruction prepared by the defense). In these circumstances, the defendant is deemed to have waived a claim of reversible error. [2] *See, e.g.*, *King*, 505 F.2d at 608–09.

---

[2] Similarly, the permissible introduction of a co-defendant's guilty plea for limited

49

However, in this case, neither the Majority nor the government asserts that the defendants invited the error at issue here.

Moreover, even in those cases where a claim of prejudice may have been waived due to the actions of the defense counsel, the resultant prejudice to the defendant may be too harmful to overlook. In *Fleetwood*, a case relied on by the Majority, the defense opened the door to the prejudicial testimony of the government's witnesses as part of its trial strategy. *See* 528 F.2d at 533. The prejudicial testimony concerned the guilty pleas of individuals who were not currently on trial with the defendant. *Id*. at 530, 532. Even with "solid evidence" of the defendant's guilt, and circumstances that were arguably less aggravated, we nevertheless concluded that the reversible circumstances contemplated by *Baete* existed—despite mitigating facts, such as that the defense invited the error and never requested corrective instructions. *See id*. at 535–36 & n.16 ("This is one of the examples anticipated by *Baete*. We doubt that any instruction, had one been given, would have cured the prejudicial impact of the testimony presented."). Our review of the facts and circumstances in their proper context resulted in our conclusion that the introduction of the co-defendants' guilty pleas and "repeated"

---

legitimate evidentiary purposes—such as when it may be necessary to impeach trial testimony or to challenge the credibility of a witness—is not before us. *See United States v. Harrell*, 436 F.2d 606, 614 (5th Cir. 1970).

questioning of the government's witnesses as to the same "so taint[ed] the trial of [the defendant] that the error could not be cured . . . ." *Id.* at 535. Thus, given the circumstances in *Fleetwood*—and despite the potentially mitigating facts—reversal was warranted.

In comparison, here, the error was uninvited by defense counsel; it was not part of the defense counsel's trial strategy and indeed ran counter to the unified defense theory. The district court sua sponte introduced the plea of a co-conspirator to the conspiracy: what Gonzalez pled (guilty) *and* what she pled guilty to (the conspiracy charge). Further, in *Fleetwood*, the guilty plea at issue was from witnesses who were not alleged to have been members of a conspiracy for which the defendant was being tried, whereas this case involves the guilty plea of an individual charged with the *same crime* as the remaining defendants.[3] *See id.* These circumstances are surely more prejudicial and harmful than those in *Fleetwood*, and I fail to see why reversal was warranted there but not here.

Indeed, in a case where the district court introduced the error, we concluded that reversal was warranted. In *Vaughn*, a conspiracy case, the trial court told the jury at the outset "that some of the co-indictees had pled guilty." 546 F.2d at 50.

---

[3] Additionally, although the defendants' counsel did not contemporaneously object to the district court's disclosure, which they argue was "the result of tactical considerations" to avoid further prejudicing their clients, *see Fleetwood*, 528 F.2d at 532, they did move for a mistrial on this basis.

51

The court's disclosure "thus solemnly confess[ed] the existence of the conspiracy and their participation in it." *Id.* There, as here, the court gave a curative instruction, "warn[ing] the jury . . . that the pleas had nothing at all to do with the guilt or innocence of the defendants about to go to trial." *Id.* Nevertheless, on appeal, the curative instruction was deemed insufficient. As the court discussed,

> Did the warning that [the jurors] were not to consider these pleas remove any reasonable likelihood of harmful prejudice? It is an accepted maxim that juries are presumed to follow the instructions of the Court. This presumption, however, is not water tight, because we have often held that some things are too prejudicial to be cured by the strongest cautionary instruction.

*Id.* at 51. I would find that similar harmful prejudice exists in this case. Here, the defendants maintained a unified defense—their sole defense to the conspiracy charges against them—which was that they did not know their actions were illegal. The subsequent destruction of that defense by the district court's uninvited revelation that one of the co-conspirators pled guilty—admitting "the existence of the conspiracy and [her] participation in it"—renders this case "too prejudicial to be cured by the strongest cautionary instruction." *See id.* at 50, 51.

The Majority, however, attempts to distinguish *Vaughn* because of "the nature of the fraud here, and the strength of the Government's evidence." Maj. op. at 18. But "[a]n error may substantially influence an outcome and thus warrant reversal even if the evidence, had no error occurred, would have been sufficient to

support the conviction." *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir.), *corrected*, 194 F.3d 1186 (11th Cir. 1999) (discussing the harmless error standard in the context of erroneous evidentiary rulings). Gonzalez's concession of guilt as to the conspiracy charge was damning proof that at least two defendants agreed to commit an act that they knew was illegal. The existence of such an agreement was a crucial element of the charged conspiracy, and the knowledge of its illegality was the linchpin of the defendants' unified good faith defense. Indeed, we have recognized that where state of mind is at issue, the only possible direct evidence thereof is an admission by the individual with whose state of mind we are concerned. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1295 & n.9 (11th Cir. 1999). For this reason, the concession of guilt by one of the co-conspirators (and erroneous admission thereof) is particularly problematic. It served as direct evidence of the existence of the conspiracy and circumstantial evidence of the involvement of others in the conspiracy; specifically, proof of the defendants' state of mind (agreement and knowledge of illegality). Accordingly, direct evidence that Gonzalez and at least one other defendant agreed to commit an act they knew to have been illegal—provided by the district court's introduction of Gonzalez's

guilty plea—allowed the jury to look to circumstantial evidence to determine which defendant(s)—in addition to Gonzalez—was a member of the conspiracy.[4] *See Harrell*, 436 F.2d at 614 ("Jurors equally with others are aware that 'it takes two to tango.'").

And while the Majority dismisses the defendants' good faith defense as "preposterous" and "nonsensical," this characterization of the defendants' defense does not persuade me that the error here was harmless. Those are determinations best left to the jury, and there is no way for this court to determine whether the defense would have been rejected by an untainted jury. *See Vaughn*, 546 F.2d at 51 (noting that our role is constrained to deciding the matter consistently with our existing precedent because it was not possible to know whether a corrective instruction removed any likelihood of prejudice to the remaining defendants). As an appellate court, we must "simply decide the matter consistently with existing precedent." *See id.* Here, that precedent compels reversal. *See id.*; *see also Fleetwood*, 528 F.2d at 535; *Griffin*, 778 F.2d at 711.

---

[4] For this reason, co-defendant Rodriguez's acquittal does not convince me that the error was harmless. Given that the government had very little evidence to establish that Rodriguez was involved in the charged conspiracy at all, it is not surprising that he was acquitted. Thus, the fact that Rodriguez was acquitted simply establishes the lack of evidence of participation in the conspiracy as to Rodriguez; it does not address or diminish the potential for harmful prejudice as to the other coconspirators. *See Vaughn*, 546 F.2d at 50 (noting that the existence of additional evidence "does not erase the issue of whether this jury would have believed the government's testimony had it not known from the beginning that various co-indicted confederates had judicially confessed the existence of the conspiracy and their participation in it").

54

### III.

In this case, the district court's erroneous mid-trial revelation that an alleged co-conspirator pled guilty conceded the existence of the conspiracy and implicated each of the remaining defendants in it. The court's uninvited error wiped out the remaining defendants' unified, good faith defense, and such prejudice could not reasonably be cured by a subsequent instruction. The die had been cast. *See Griffin*, 778 F.2d at 711 ("In a conspiracy trial, which by definition contemplates two or more culpable parties, courts must be especially vigilant to ensure that defendants are not convicted on the theory that guilty 'birds of a feather are flocked together.'" (quoting *Krulewitch v. United States*, 336 U.S. 440, 454, 69 S. Ct. 716, 723 (1949) (Jackson, J., concurring))). Given these aggravated circumstances, the error is too prejudicial to be considered harmless beyond a reasonable doubt.

Therefore, I respectfully dissent.